**ALCAN ALUMINUM CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. 97–156.
Court No. 94–09–00539.

United States Court of
International Trade.

Nov. 21, 1997.

Barnes, Richardson & Colburn (Rufus E. Jarman, Jr. and Frederic D. Van Arnam, Jr.), New York City, for plaintiff.

Frank W. Hunger, Assistant Attorney General, Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Amy M. Rubin ); and Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service (Mark G. Nackman), of counsel, Washington, DC, for defendant.

*Opinion & Order*

AQUILINO, Judge.

This action, which has been designated a test case within the meaning of CIT Rule 84(b), contests imposition of merchandise-processing fees on imports from Canada at a rate allegedly at odds with the Free Trade Agreement in effect between that country and the United States on the dates of entry. The fees collected by the U.S. Customs Service were 0.19 percent *ad valorem* pursuant to 19 U.S.C. § 58c(a) (1993), while the plaintiff relies on the mandate of subsection 58c(b)(10) that such a fee be in accordance with article 403 of the Agreement, ergo 0.038 percent *ad valorem.*

## I

The salient facts have either been stipulated by the parties in the pretrial order or adduced at trial. They include:

4. The imported items at issue are unwrought aluminum ingots imported directly from Canada.

5. The[y] ... are classifiable under subheading 7601.10.60, HTSUS, if not alloyed[,] and under subheading 7601.20.90, HTSUS, if alloyed.

6. The primary purpose of the imported merchandise is to ... be further processed ... into wrought aluminum articles.

* * * * * *

9. The ... Customs Service required the imported merchandise to be entered as goods not originating in the territory of Canada.

10. The[y] ... contain an additive comprised of aluminum, titanium and boron (the "Additive").

11. The Additive is the product of a country not ... Canada or the United States[ ].

12. At least one percent of the weight of the Additive is attributable to the titanium and boron, with the remainder consisting of pure unwrought aluminum.

* * * * * *

14. If the Additive were not present in the imported merchandise, it would have been treated by Customs as goods originating in ... Canada.

* * * * * *

16. The aluminum in the Additive acts only as a carrier for the Active Ingredients.

17. Because titanium and boron have low solubility in molten aluminum, the(y) ... can not be added directly to the melt from which the imported ingots are cast. Therefore, to achieve the uniform dispersion of the[m] ... throughout the imported merchandise during its manufacture, the titanium and boron are first dissolved in a small amount of pure aluminum and the combination of aluminum carrier and titanium and boron are then added to the melt.

* * * * * *

19. The Additive constitutes less than one percent, by weight and value, of the imported merchandise.

* * * * * *

27. Aluminum producers add grain refiners during ... casting ... to control crystal formation during solidification, reduce ingot cracking, promote the flow of the molten metal, reduce porosity, create better homogeneity of the finished product, promote better mechanical deformation characteristics, improve the mechanical properties of the aluminum, and reduce cost by increasing yields.[1]

28. Titanium (Ti) and boron (B) ... are added to the aluminum in order to refine the as-cast grain size.... $TiAl_3$ and $TiB_2$ [ ] are micron sized particles present in the additive. $TiAl_3$ particles partially dissolve in the aluminum, and also react with $TiB_2$, which does not dissolve, to form very potent nuclei for grain nucleation.

29. In general, fine-grained aluminum is stronger than coarse-grained aluminum....

Pretrial Order, Schedule C.

All liquidated duties and the fees relating to the foregoing merchandise having been paid, and the administrative protest process having run its course, this court is now properly possessed of jurisdiction pursuant to 28 U.S.C. § 1581(a).

## II

The dispositive issues, as posited by the plaintiff, are whether the principle *de minimis non curat lex* counsels disregard of the grain refiner in determining that the aluminum qualified for a reduced processing fee under the Free Trade Agreement with Canada[2] or whether either a tariff shift or sub-

---

1. See also trial transcript ("Tr."), pp. 53, 71, 75–76, 94, 121, 125–26, 131–32, 195–97.

2. The text of this agreement, which entered into force January 1, 1989 and which is referred to sometimes hereinafter by the acronym "CFTA",

stantial transformation made that additive a good originating there. *See id.,* Schedule F–1; Plaintiff's Pretrial Brief, p. 8.

### A

■ The plaintiff has conceded from the beginning that neither CFTA and the official records of its negotiation nor the United States–Canada Free–Trade Agreement Implementation Act of 1988, Pub.L. No. 100–449, 102 Stat. 1851, and its legislative history "contain[ ] any reference to the *de minimis* principle." Complaint, paras. 31, 32. *See also* Pretrial Order, Schedule C, para. 32. It is also true, as the plaintiff points out, that this principle that the law does not concern itself about trifles [3] has found application in court and also in legislation, administrative regulation and even international accord. *See, e.g., Seeberger v. Schlesinger,* 152 U.S. 581, 14 S.Ct. 729, 38 L.Ed. 560 (1894); *Wisconsin Dep't of Revenue v. Wm. Wrigley, Jr. Co.,* 505 U.S. 214, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992); *Overton & Co. v. United States,* 5 U.S.Cust.App. 183, T.D. 34322 (1914); *United States v. Cavalier Shipping Co.,* 60 CCPA 152, C.A.D. 1103, 478 F.2d 1256 (1973); *Washington Red Raspberry Comm'n v. United States,* 859 F.2d 898 (Fed. Cir.1988); *Canada Dry Ginger Ale, Inc. v. United States,* 43 Cust.Ct. 1, C.D.2094, 1959 WL 8882 (1959); *Carlisle Tire & Rubber Co. v. United States,* 10 CIT 301, 634 F.Supp. 419 (1986); 19 C.F.R. § 353.6, § 355.7 (1993). Indeed, the principle is embedded in the North American Free Trade Agreement ("NAFTA") [4] which supplanted CFTA effective January 1, 1994 [5], and in the statute which the U.S. Congress enacted to effectuate this accord. See North American Free

Trade Agreement Implementation Act, Pub.L. No. 103–182, § 202(e), 107 Stat. 2057, 2076–78 (1993).

The threshold issue raised by the plaintiff thus requires the court to first consider the language of CFTA and its related legislation and, only if ambiguity exists, then any reported intent of those who negotiated or drafted the controlling provisions. Paragraph 1 of article 301 of the Agreement set forth the general rule that "Goods originate in the territory of a Party if they are wholly obtained or produced in the territory of either Party or both Parties." Section 202(a)(1) of the implementation act provided, in part:

> For purposes of implementing the tariff treatment contemplated under the Agreement, goods originate in the territory of a Party if—
>
> (A) they are wholly obtained or produced in the territory of either Party or both Parties; . . . .

102 Stat. at 1856, 19 U.S.C. § 2112 note (1993). Section 104 of the act tied CFTA to the Harmonized System of classification of merchandise, and a general note of the Harmonized Tariff Schedule of the United States ("HTSUS") governing products for special tariff treatment thereunder, in referring to the act, stated, again in pertinent part, that

> goods imported into the customs territory of the United States are eligible for treatment as *"goods originating in the territory of Canada"* only if—
>
> (1) they are goods wholly obtained or produced in the territory of Canada and/or

is reproduced in 27 International Legal Materials ("I.L.M."), p. 293 *et seq.* (1988).

The merchandise covered by this action entered the United States in 1993, and article 403, section 3 of CFTA committed the U.S. government to
eliminate existing customs user fees on goods originating in the territory of Canada according to the following schedule:
. . . d) with respect to goods entered or withdrawn from warehouse for consumption on or after January 1, 1993, the user fee shall be 20 percent of the user fee otherwise applicable on that date; . . . .

As already pointed out, that fee at that time, in accordance with 19 U.S.C. § 58c(a), was 0.19 percent *ad valorem,* hence plaintiff's claim that the fees for its imports should have been only 0.038 percent *ad valorem.*

3. Black's Law Dictionary, p. 431 (6th ed.1990).

4. See 32 I.L.M., pp. 296, 352–53 (Art. 405) (1993).

5. *See id.* at 297 (Art. 103) and at 702 (Art. 2203); North American Free Trade Agreement Implementation Act, Pub.L. No. 103–182, § 107, 107 Stat.2057, 2065–66 (1993).

the United States.... [6]

■ In *Xerox Corporation v. United States*, 41 F.3d 647, 652 (Fed.Cir.1994), *cert. denied*, 516 U.S. 817, 116 S.Ct. 72, 133 L.Ed.2d 32 (1995), the court explained that, in

construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. *See United States v. Stuart*, 489 U.S. 353, 365–66, 109 S.Ct. 1183, 1190–91, 103 L.Ed.2d 388 (1989) (interpreting a treaty to carry out the intent or expectations of the signatories); *Kolovrat v. Oregon*, 366 U.S. 187, 193–94, 81 S.Ct. 922, 925–26, 6 L.Ed.2d 218 (1961) (a treaty should be interpreted to carry out its purpose). As discussed in *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), the court's role is "limited to giving effect to the intent of the Treaty parties." *See generally* Restatement (Third) of Foreign Relations Law of the United States, Part III, Introductory Note at 144–145 (1987). The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty. *Valentine v. United States*, 299 U.S. 5, 11, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936) ("it is our duty to interpret [the treaty] according to its terms. These must be fairly construed, but we cannot add or detract from them.")

Unless the treaty terms are unclear on their face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the final document....

The same, of course, can and has been said for judicial review of domestic enactments. Hence, the "normal source for determining legislative intent is the statutory language itself, 'which is presumed to be used in its normal sense, in the absence of proof of a special meaning in the trade.'" *Holford USA Ltd. v. United States*, 19 CIT ——, ——, 912 F.Supp. 555, 561 (1995), quoting *United States v. Esso Standard Oil Co.*, 42 CCPA 144, 151, 1955 WL 6827 (1955). If a particular word is not defined, a court will "normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138, *reh'g denied*, 509 U.S. 940, 114 S.Ct. 13, 125 L.Ed.2d 765 (1993), citing *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979).

The language at issue herein and quoted above, on its face, is clear. Though not exactly *in haec verba* from one level of adoption to the next, the principle for which it stands is hardly ambiguous or susceptible to interpretive disagreement.[7] The dispositive

6. HTSUS General Note 3(c)(vii)(B)(1993) (underscoring in original). This note 3(c)(vii) further provided:

(L) As used in subdivision (c)(vii)(B) of this note, the phrase *"goods wholly obtained or produced in the territory of Canada and/or the United States"* means—

(1) mineral goods extracted in the territory of Canada and/or the United States,

(2) goods harvested in the territory of Canada and/or the United States,

(3) live animals born and raised in the territory of Canada and/or the United States,

(4) fish, shellfish and other marine life taken from the sea by vessels registered or recorded with Canada and flying its flag,

(5) goods produced on board factory ships from the marine life referred to in subparagraph (4) provided such factory ships are registered or recorded with Canada and fly its flag,

(6) goods taken by Canada or a Canadian national or enterprise from the seabed or

beneath the seabed outside territorial waters, provided that Canada has rights to exploit such seabed,

(7) goods taken from space provided they are obtained by Canada or a Canadian national or enterprise and not processed in a third country,

(8) waste and scrap derived from manufacturing operations and used goods, provided they were collected in the territory of Canada and/or the United States, and are fit only for the recovery of raw materials, and

(9) goods produced in the territory of Canada and/or the United States exclusively from goods referred to in subparagraphs (1) to (8), inclusive, or from their derivatives, at any stage of production.

(Underscoring in original)

7. Perhaps the word "only" was added to the HTSUS General Note 3(c)(vii)(B) promulgation as emphasis in this regard.

word "wholly" is defined by Webster's Third New International Dictionary of the English Language Unabridged (1993) at page 2612 to mean:

> 1: to the full or entire extent: without diminution or reduction: ALTOGETHER, COMPLETELY, TOTALLY
>
> 2: To the exclusion of other things: SOLELY

*See also* Funk & Wagnalls New Standard Dictionary of the English Language, p. 2710 (1930); Webster's New International Dictionary of the English Language (Unabridged), p. 2922 (2d ed.1945). Such definition(s) leave little room to gainsay sole Canadian content for special tariff treatment.[8]

Nonetheless, the plaintiff contends that it is "beyond debate that the goal of the CFTA was to eliminate trade barriers, not to create them."[9] The court concurs, but this does not necessarily compel the relief prayed for. While CFTA article 403 was in furtherance of this goal, the fact that it established a schedule for the gradual reduction of fees of the kind contested herein scarcely signifies intent that *de minimis* play any role during that timeframe. Indeed, the plaintiff did not give any indication at trial (or in its thorough papers presented both before and after) that the government of Canada or its negotiators considered imposition of the fees violative of their understanding, nor has this court otherwise discerned any such reaction.

The plaintiff does point to instances during the time CFTA was in effect when U.S. Customs did not decline preferential treatment of imports from other neighboring countries due to minimal content from elsewhere in the world. The examples proffered are HQ 544195 (Feb. 27, 1990) and HQ 556798 (Sept. 23, 1993). The first granted duty-free treatment under the Caribbean Basin Economic Recovery Act, 19 U.S.C. § 2701 *et seq.*, for ethanol produced in St. Kitts for use as canned heating fuel or charcoal lighter upon mixture with a U.S.-produced gelling agent in amounts by volume of 3.5 and .75 percent, respectively. The second ruled, among other things, that latex gloves made in Malaysia and included in some catheterization sets assembled in Mexico for export to the United States, and which ranged from .63 to 5.0 percent of the total value of the various sets, represented *de minimis* elements thereof and therefore did not defeat the "product of" requirement of the Generalized System of Preferences, 19 U.S.C. § 2461 *et seq.*[10] Whereupon the plaintiff asks:

> ... If Customs applies the *de minimis* principle in determining eligibility for special tariff treatment under the GSP or CBERA ..., neither of which contain an express *de minimis* exception, why does it not also apply this common law doctrine in determining eligibility under the CFTA?[11]

Suffice it to answer that the U.S. government has discretion in administering the law governing imports (and also relations with their foreign sources) but only as delineated by the components of that law. Plaintiff's counsel contend that nothing in the law implicated at bar specifically precluded the *de minimis* principle, which was also the case under GSP and CBERA. This court cannot and therefore does not conclude, however, that the components quoted and discussed heretofore mandated resort thereto—or that,

---

8. To quote from the regulation of Customs with regard to originating goods:

> (a) *General.* For purposes of eligibility for a preference under the Agreement, goods may be regarded as originating goods if:
>
> (1) *Wholly of Canadian or United States origin.* The goods are wholly obtained or produced in the Territory of Canada or the United States, or both, as set forth in General Note 3(c), HTSUS....

19 C.F.R. § 10.303(a)(1) (1993) (italics in original).

9. Plaintiff's Pretrial Brief, p. 10, referring to CFTA Art. 102 and section 2 of its implementation act, 102 Stat. at 1852.

10. To its Reply to Defendant's Post–Trial Memorandum, the plaintiff, whose motion for leave to file this brief is hereby granted, also appends a copy of HQ 556451 (Jan. 28, 1992), holding, in part, that a magnifier produced in Hong Kong and valued at $0.25 and an eye dropper made in Taiwan and valued at $0.08 and included in a laboratory kit otherwise made in Israel for children at a total value of $10.85 did not foreclose duty-free treatment under this Generalized System of Preferences.

11. Plaintiff's Reply, p. 10.

in failing to do so, Customs either abused its discretion or violated the law.[12] Indeed, by the time of plaintiff's entries, the NAFTA negotiators had decided to make *de minimis non curat lex* a specific principle of their superseding trade agreement. And to quote commentary in this regard:

> One problem encountered by certain producers under the FTA was that goods produced in Canada ... did not qualify for free trade treatment because a non-originating component of insignificant value did not undergo the required change in tariff classification as prescribed in the FTA rules of origin. As the FTA did not contain a relieving provision which would apply in these circumstances, the finished good did not qualify for free trade treatment.
>
> NAFTA addresses the issue with a *de minimis* rule. With certain exceptions, a good will be considered to be an originating good, even if certain non-originating materials do not undergo the required change in tariff classification....

Baker & McKenzie, NAFTA Handbook, ¶ 305, pp. 41–42 (CCH 1994).

### B

■ The required change in tariff classification to which this commentary refers is formulated as follows in paragraph 2 of CFTA article 301, to wit:

> ... [G]oods originate in the territory of a Party if they have been transformed in the territory of either Party or both Parties so as to be subject to a change in tariff classi-

fication as described in Annex 301.2 ..., and they meet the other conditions set out in that Annex.

27 I.L.M. at 295. Among those conditions in that Annex are that the Harmonized System be the basis of classification and that any goods transformed in Canada not undergo any subsequent processing or assembly elsewhere. *See id.* at 297.

The evidence does not show any subsequent manufacture. The plaintiff argues that the titanium and boron, the active ingredients in Alcan's imported grain refiners[13], impart the "essential character" thereof, whereupon it refers to HTSUS General Rule of Interpretation ("GRI") 3(b) to the effect that

> Mixtures, composite goods consisting of different materials or made up of different components ..., which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character....

In other words, the gist of plaintiff's position appears to be that the grain refiners entered Canada as titanium and articles thereof, classifiable under chapter 81 of its harmonized Customs Tariff. And the parties have stipulated that the Alcan merchandise, containing that additive, entered the United States, classifiable under chapter 76 of the HTSUS.

■ It is well-settled, however, that when HTSUS headings and chapter notes are dispositive GRI 1 governs, and courts need not refer to subordinate rules of interpretation.

---

**12.** The court notes in passing defendant's position that Alcan's grain refiners, in reality, may not be *de minimis* since they perform a "commercially significant function". *Cf.* Tr. at 113, 159, 201. According to the defendant, not only must the relative amount of such additive be low, its function(s) must be found "insignificant, irrelevant, trifling, of no commercial value, and unrelated to the main purpose of the imported merchandise." Defendant's Pretrial Memorandum, p. 25. The plaintiff responds that the proper test is not whether the refiners are commercially significant in the finished product, but rather whether they impart the "exact characteristic which is the primary use characteristic." Plaintiff's PostTrial Memorandum, p. 30, quoting *Aceto Chemical Co. v. United States*, 75 Cust.Ct. 167, 408 F.Supp. 1389, C.D. 4625 (1975), *aff'd*, 64 CCPA 78, 553 F.2d 685 (1977). In Alcan's view,

the additive does not impart that characteristic, "that is done by the aluminum and any alloying elements that have been added." *Id.* at 31.

**13.** It was adduced at trial that their aluminum carrier comes in various forms, including rod and "waffle". Plaintiff's exhibit 22 is a piece of rod, composed of 5 percent titanium, 1 percent boron and 94 percent aluminum, while exhibit 23 (in waffle form) has 90 percent aluminum, 10 percent titanium and no boron. *See* Tr. at 61, 60. *See also* Plaintiff's Exhibit 1–I. *See generally* Plaintiff's Exhibits 4, 6, 10, 16; Defendant's Exhibits F, G, H. To the extent grain refiner was added to the individual products at bar, the aluminum medium was in rod form. *Compare* Tr. at 72, 96–97, 99, 110 and 113 with *id.* at 62.

**1443**

*See, e.g., Pima Western, Inc. v. United States,* 20 CIT ——, ——, 915 F.Supp. 399, 403 (1996). That first interpretive rule is that, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes". Note 3 to HTSUS section XV (Base Metals and Articles of Base Metal) covers classification of alloys (other than ferroalloys and master alloys as defined in chapters 72 and 74), in part, as follows:

(a) An alloy of base metals is to be classified as an alloy of the metal which predominates by weight over each of the other metals.

(b) An alloy composed of base metals of this section and of elements not falling within this section is to be treated as an alloy of base metals of this section if the total weight of such metals equals or exceeds the total weight of the other elements present.[14]

And subheading Note 1(b) to Chapter 76 (Aluminum and Articles Thereof) defines aluminum alloys as

Metallic substances in which aluminum predominates by weight over each of the other elements, provided that:

(i) The content by weight of at least one of the other elements or of iron plus silicon taken together is greater than the limit specified in the ... table [to subheading Note 1(a)]; or

(ii) The total content by weight of such other elements exceeds 1 percent.

■ Given the contents of the grain refiners adduced at trial, they are covered by this definition. And, while it is true that a product literally included in a tariff definition may nonetheless be excluded upon a showing of legislative intent, "there must be 'strong and sufficient indications that it was the intent of Congress' to exclude the product at issue". *Washington Int'l Ins. Co. v. United States,* 24 F.3d 224, 226 (Fed.Cir.1994), quoting

*United States v. Andrew Fisher Cycle Co.,* 57 CCPA 102, 426 F.2d 1308, 1311 (1970). Since those indications are not reflected on the record developed herein, and the CFTA contracting parties are bound by the Harmonized System, the court concludes that no change in tariff classification under their Agreement and that System took place.

**C**

■ Although the word transformed is contained in CFTA article 301, the plaintiff contends that

the enactment of the CFTA implementing legislation did not abrogate or supersede an importer's right to have the court apply the common law substantial transformation test under these facts.[15]

The court concurs. *Cf.* 19 C.F.R. § 134.35 (1993) (Articles substantially changed by manufacture); *CPC Int'l, Inc. v. United States,* 20 CIT ——, ——, 933 F.Supp. 1093, 1102 (1996), *reh'g denied,* 21 CIT ——, 956 F.Supp. 1014, *remand aff'd,* 21 CIT ——, 971 F.Supp. 574 (1997):

... NAFTA did not obligate the United States to replace its well established *Gibson–Thomsen* substantial transformation test for an ultimate purchaser under [19 U.S.C.] § 1304(a), Congress did not do so under the Implementation Act, and Congress did not intend to delegate the authority to do so to Customs.

■ Relying on the seminal case referred to, namely, *United States v. Gibson–Thomsen Co.,* 27 CCPA 267, C.A.D. 98, 1940 WL 4085 (1940), the plaintiff takes the position that grain refiner is a unique and discrete article of commerce, which is substantially transformed into a new and different article when it is melted into and becomes part of the molten aluminum and then of the cast unwrought ingot. Plaintiff's PostTrial Memorandum, pp. 34–35. Stated another way, both

14. Literature on metals has long defined alloy as a substance having metallic properties and being composed of two or more chemical elements of which at least one is an elemental metal. *See, e.g.,* 1 Metals Handbook, Properties and Selection of Metals, p. 1 (8th ed.1961).

15. Plaintiff's PostTrial Memorandum, p. 38. The defendant objects to plaintiff's raising of this argument as out of order, but the court cannot concur in the light of the facts and circumstances of this action, and defendant's objection is thus hereby overruled.

the TiAl$_3$ particles present in the grain refiner and the aluminum simply become part of the molten aluminum, and the grain refiner, as a discrete commercial article, exists no more, having first become molten metal, and then an unwrought aluminum ingot. After solidification, the remaining TiB$_2$ has finished grain refining, and exists as a micron-sized particle in the formed ingot. It cannot be removed and reused as a grain refiner.

*Id.* at 37. The government replies that the TiB$_2$ particles remain intact throughout the casting process, serving only as nucleating sites, which undergo no physical transformation. *See* Defendant's Post–Trial Brief, pp. 36–37.

■ In applying the test posited by the plaintiff, there "must be transformation; a new and different article must emerge 'having a distinctive name, character or use.' " *Anheuser–Busch Brewing Ass'n v. United States,* 207 U.S. 556, 562, 28 S.Ct. 204, 207, 52 L.Ed. 336 (1908). This court must also probe "whether operations performed on products in the country of exportation are of such a substantial nature to justify the conclusion that the resulting product is a manufacture of that country." *Ferrostaal Metals Corp. v. United States,* 11 CIT 470, 473, 664 F.Supp. 535, 537 (1987). Several factors are considered in the application of this test, including whether significant costs are incurred and/or value added by the process at issue [16] and whether that process "transforms the import so that it is no longer the essence of the final product." *National Juice Products Ass'n v. United States,* 10 CIT 48, 60, 628 F.Supp. 978, 990 (1986), citing *United States v. Murray,* 621 F.2d 1163, 1170 (1st Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980).

Here, the grain refiner is dispersed throughout the molten aluminum but not transformed substantially during processing. *See, e.g.,* Tr. at 118, 119, 139, 181–82, 214.

Its active ingredients serve as a nucleating agent which have

> a role to play just when the metal turns from liquid to solid, as they will act as . . . a nucleating site to form a grain. And once the grain is formed, they're captured in the grain and that's their role.

*Id.* at 75. *See also id.* at 234–35. *Cf.* Plaintiff's Exhibit 7; Defendant's Exhibit E. While that role helps to control crystal formation during solidification, reduce ingot cracking, promote the flow of the molten metal, reduce porosity, create better homogeneity of the finished product, promote better mechanical deformation characteristics and improve the mechanical properties of the aluminum [17], the evidence shows that such effects are also possible without the addition of any grain refiner. *See* Tr. at 72, 96, 203. When it is added for the purpose of reducing costs by increasing yields [18], no complicated or expensive process is involved. In short, the evidence does not support plaintiff's premise of substantial transformation, given the nature of the merchandise. To the extent one could argue there has been at least a change of name, typically such a change has not been held dispositive. *See, e.g., United States v. Int'l Paint Co.,* 35 CCPA 87, 93–94, C.A.D. 376, 1948 WL 5030 (1948).

### III

To summarize the foregoing findings of fact and conclusions of law, the court holds that the fees collected by the U.S. Customs Service on plaintiff's entries underlying this action were in accordance with CFTA and the statutes and regulations relating thereto. Judgment will enter accordingly.

So ordered.

---

**16.** *See, e.g., Superior Wire v. United States,* 11 CIT 608, 614, 669 F.Supp. 472, 478 (1987), *aff'd,* 867 F.2d 1409 (Fed.Cir.1989).

**17.** Pretrial Order, Schedule C, para. 27.

**18.** *See id.*