**ALCAN ALUMINUM CORPORATION, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 98–1172.

United States Court of Appeals, Federal Circuit.

Jan. 5, 1999.

Rufus E. Jarman, Jr., Barnes, Richardson & Colburn, New York, New York, argued for plaintiff-appellant. With him on the brief was Frederic D. Van Arnam, Jr.

Amy M. Rubin, Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, International Trade Field Office, New York, New York, argued for defendant-appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director, U.S. Department of Justice, Washington, DC; and Joseph I. Liebman, Attorney in Charge, International Trade Field Office.

Before MAYER, Chief Judge, and NEWMAN and CLEVENGER, Circuit Judges.

Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Chief Judge MAYER.

CLEVENGER, Circuit Judge.

Appellant Alcan Aluminum Corporation requests reversal of the Court of International Trade's decision affirming the United States Customs Service's imposition of merchandise processing fees on imported aluminum ingots at a rate greater than that permitted by the United States–Canada Free–Trade Agreement of 1988. *See Alcan Aluminum Corp. v. United States,* 986 F.Supp. 1436 (CIT 1997). Because the Court of International Trade erred by finding the common-law "substantial transformation" test available as an alternative to the transformation requirements of General Note 3(c)(vii)(B)(2) of the 1993 Harmonized Tariff Schedule of the United States, and failed to construe General Note 3(c)(vii)(B)(2) in light of the well-recognized

doctrine of de minimis non curat lex, we reverse.

## I

This dispute arose when the Alcan Aluminum Corporation ("Alcan") imported from Canada unwrought aluminum ingots, seeking preferential trade status under the United States–Canada Free–Trade Agreement Implementation Act of 1988 ("USCFTA Act"), Pub.L. No. 100–449, 102 Stat. 1851 (1988). *See also* 19 U.S.C. § 2112 note (1994). Section 202 of the USCFTA Act allowed "goods originating in the territory of Canada" to qualify for merchandise processing fee of 0.038 percent *ad valorem*, greatly reduced from the 0.19 percent imposed on ineligible imports.[1] *See* 19 U.S.C. §§ 58(a), (b)(10) (1993) (authorizing full and reduced merchandise processing fees respectively).

## A

At the time of their import, Alcan asserted that the aluminum ingots, comprised of both Canadian and "offshore"—non-Canadian— materials, underwent the "transformation" required by HTSUS General Note 3(c)(vii)(B)(2) (1993) (codifying section 202(a)(1)(B) of the USCFTA Act), and thus constituted "goods originating in the territory of Canada" that qualified for the reduced merchandise processing fee. The United States Customs Service ("Customs") disagreed, and imposed the full merchandise processing fee because a small amount—less than one percent by weight and value—of the ingredients used in production of the ingots did not undergo a tariff classification shift, as required by General Note 3(c)(vii)(B)(2)(I). Upon paying the fees and exhausting administrative remedies, Alcan filed suit in the Court of International Trade. After a two-day trial, that court issued a ruling affirming Customs' decision, holding (1) that while the common-law "substantial transformation" test established by *United States v. Gibson–Thomsen Co.*, 27 C.C.P.A. 267, 1940 WL 4085 (1940), was applicable to the "transformation" requirement in General Note

3(c)(vii)(B)(2), the imported merchandise did not undergo such a transformation, and (2) that the principle of de minimis non curat lex did not apply to the terms of that subsection. *See Alcan*, 986 F.Supp. at 1436. Alcan appealed to this court. Our jurisdiction is pursuant to 28 U.S.C. § 1295(a)(5) (1994).

■ We review the Court of International Trade's interpretation of statutory provisions de novo. *See Midwest of Cannon Falls, Inc. v. United States*, 122 F.3d 1423, 1426 (Fed. Cir.1997); *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483 (Fed.Cir.1997).

## B

■ The imported goods, aluminum ingots, are a common bulk form of aluminum alloy, weighing on the order of 25,000 pounds each. Aluminum purchased in ingot form is generally intended to be further processed into wrought aluminum products as varied as aluminum cans and airplane skins. During the production process, a small amount of "grain refiner" is fed into the molten aluminum, primarily to prevent cracking during the ingot casting process or transportation. The ingots involved in this dispute contained grain refiner purchased in rod form and originating outside of Canada, forming the sole basis of Customs' rejection of preferential trade status.

The parties do not dispute that the materials used to produce the aluminum alloy ingots—apart from the grain refiner—underwent the requisite transformation in Canada to earn the reduced merchandise processing fee. The parties also stipulate that the amount of grain refiner used is trivially small: less than one percent, by weight and value, of the total aluminum ingots. The grain refiner itself is almost entirely aluminum, with less than six percent of its weight coming from the active ingredients, titanium and boron. When introduced into the molten aluminum alloy, the titanium and boron form $TiB_2$ molecules, which act as nuclei for grain formation during solidification, while the aluminum component of the grain refiner acts

---

1. The use of the past tense reflects the fact that the terms of the North American Free Trade Agreement Implementation Act, Pub.L. No. 103–

182, § 107, 107 Stat.2057, 2065–66 (1993), superseded the USCFTA Act on January 1, 1994.

merely as a carrier that helps disperse the TiB$_2$ molecules throughout the molten alloy. The resulting fine-grained aluminum alloy ingot is somewhat stronger than ingots produced without grain refiner and thus more resistant to cracking during production and shipment.

## C

The relevant portion of HTSUS General Note 3(c)(vii)(2)(I) (1993) allowed goods to be classified as "originating in the territory of Canada" (and thus subject to lower merchandise processing fees) if they "ha[d] been transformed in the territory of Canada and/or the United States, so as to be subject to a change in tariff classification as described in the rules of subdivision (c)(vii)(R) of this note[.]" Subdivision (c)(vii)(R)(15) defined a qualifying tariff shift as "[a] change from one chapter to another" within Chapters 72 to 83, and (c)(vii)(R)(15)(rr) allowed a change to a heading between 7604 and 7606 from any heading outside that group. Under the version of the HTSUS then in effect, grain refiner in rod form was classifiable under heading 7604 (Chapter 76), while the aluminum ingots themselves were classifiable in heading 7601 (also Chapter 76). Although Alcan argued below that the grain refiner should not have been classified under Chapter 76 (aluminum) because its "essential character" was imparted by the titanium and boron active ingredients, it abandons that position here, essentially conceding that the grain refiner did not meet the requirements of subdivision (c)(vii)(R)(15). Instead, Alcan argues that the grain refiner was "substantially transformed" under the common-law *Gibson–Thomsen* test, and that the de minimis amount of grain refiner in the aluminum ingots should not have prevented the application of General Note 3(c)(vii)(B)(2). Customs, for its part, asserts that the Court of International Trade erred by applying the *Gibson–Thomsen* test in place of the requirements of General Note 3(c)(vii)(B)(2), but that the Court of International Trade's refus-

al to recognize a de minimis exception is correct. We address these contentions in turn below.

## II

In upholding Customs' conclusion that the aluminum ingots did not originate in Canada (and thus failed to qualify for a reduced merchandise processing fee), the Court of International Trade found the common-law "substantial transformation" test, established by *United States v. Gibson–Thomsen Co.*, 27 C.C.P.A. 267, 1940 WL 4085 (1940), applicable to the question of whether or not the aluminum ingots imported from Canada in this case were "goods transformed in the territory" of Canada for the purposes of HTSUS General Note 3(c)(vii)(B)(2) (1993).[2] *Alcan*, 986 F.Supp. at 1442. That is, the Court of International Trade ruled that goods meeting the *Gibson–Thomsen* rule would be considered to originate in Canada, regardless of whether they were "transformed" according to General Note 3(c)(vii)(B)(2). This conclusion is incorrect as a matter of law.

Neither the USCFTA Act nor the pertinent provisions of the 1993 HTSUS mention the *Gibson–Thomsen* substantial transformation test, and in the sections relevant to this case instead affirmatively establish a wholly distinct set of rules. *Compare* Pub.L. No. 100–449, § 202(a)(1)(B), 102 Stat. 1856 (1988), *and* HTSUS (1993) General Note 3(c)(vii)(B)(2) *with Gibson–Thomsen*, 27 C.C.P.A. at 273. In addition, the *Gibson–Thomsen* test was formulated to consider the country-of-origin question solely in the context of rules governing the marking of imported goods, 27 C.C.P.A. at 267, which is, of course, distinct from the country-of-origin analysis here. *Cf.* HTSUS General Note 3(c)(vii)(B) (1993). Indeed, Alcan cannot point to a single case—nor has this court found one—where *Gibson–Thomsen* has been applied beyond the product marking context. Therefore, appellant's argument

---

2. The *Gibson–Thomsen* substantial transformation test provides that when articles of commerce "are so processed in the United States that each loses its identity in a tariff sense and becomes an integral part of a new article having a new name, character, and use," the resulting "new article" need not be marked so as to indicate their foreign origin to the "ultimate purchaser in the United States." 27 C.C.P.A. at 273.

that "the enactment of the [USCFTA Act] did not abrogate or supersede ... the common law substantial transformation test under these facts" fails to persuade us that the *Gibson–Thomsen* rule for product marking should now for the first time be established as a distinct and parallel country-of-origin test for the purposes of HTSUS General Note 3(c)(vii) (1993). Our duty is to fairly construe the terms of the statute, not add to them. *See, e.g., Farrel Corp. v. United States Int'l Trade Comm'n,* 949 F.2d 1147, 1153 (Fed.Cir.1991) ("To recognize an additional exception [to a statute requiring the ITC to conclude investigations with findings] would not only violate traditional canons of statutory interpretation, but, in this case, would create an exception inconsistent with those specified by Congress."). Even if we accepted Alcan's premise that the common-law substantial transformation test pre-dated the country-of-origin rules in General Note 3(c)(vii), we note that Federal courts are not general common-law courts, *see Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and thus "when Congress addresses a question previously governed by a decision rest[ing] on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." *City of Milwaukee v. Illinois,* 451 U.S. 304, 314, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). The Court of International Trade erred in finding the substantial transformation test applicable to the facts of this case.

Because we hold that the *Gibson–Thomsen* test does not create an alternative to the transformation requirement of General Note 3(c)(vii)(B)(2), Alcan's further argument that the Court of International Trade erred in concluding that the aluminum ingots did not undergo a "substantial transformation" in Canada is moot.

III

We now turn to the question of whether the tariff shift requirement in HTSUS General Note 3(c)(vii)(B)(2)(I) (1993) (specifying that certain changes in tariff classification allow goods to be considered "transformed" and thus of Canadian origin) is itself subject to the principle of de minimis non curat lex ("the law does not care for trifles").[3] Alcan argues on appeal that the terms of 3(c)(vii)(B)(2)(I) must be construed in light of de minimis, and that under such an interpretation, the addition of grain refiner— which it concedes does not undergo a qualifying tariff shift—in an amount less than one percent by weight and value does not prevent the determination that the aluminum ingots qualify as originating in Canada. In other words, because only a trivial amount of the imported goods does not perform the tariff shift required by HTSUS General Note 3(c)(vii)(B)(2)(I) (1993), Alcan asks that the de minimis principle be used to acknowledge that goods that are more than 99 percent "shifted" meet the requirement of that subsection. We agree.

A

As the Supreme Court stated in *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.,* 505 U.S. 214, 231, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992), "de minimis ... is part of the established background of legal principles against which all enactments are adopted, and ... which all enactments are deemed to accept." As such, courts have recognized this principle in a wide variety of statutory contexts. *See, e.g., Republic of Argentina v. Weltover,* 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) ("Of course the generally applicable principle de

**3.** The Court of International Trade appears to have construed Alcan's request for Canadian origin as being pursuant to General Note 3(c)(vii)(B)(1), which requires qualifying goods to be "wholly obtained or produced in the territory of Canada and/or the United States." *See Alcan,* 986 F.Supp. at 1439. The parties do not dispute that this subsection was not suggested to the Court of International Trade as a ground upon which the ingots might be found to "originate in the territory of Canada." Indeed, Alcan notes

that, because material used in production of the ingots was not "obtained or produced" in Canada and/or the United States, such an argument would have been useless. Because our review of the statutory interpretation below is de novo and Alcan's Complaint put—at minimum—all of General Note 3(c)(vii)(B) into play, the Court of International Trade's focus on the phrase "wholly obtained or produced" is immaterial to our analysis.

minimis non curat lex ensures that jurisdiction may not be predicated on purely trivial effects in the United States."); *Hudson v. McMillian*, 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind" (internal quotations omitted).); *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned."); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) ("The de minimis rule can doubtless be applied to much of the [allegedly compensable time walking to and from the time clock on the employer's premises] involved in this case."). De minimis is no less firmly entrenched in the law regarding imported goods, resulting in, for example, holdings that "[g]oods more than 98 per cent jute are to be regarded [for the purposes of customs classification] as articles composed of jute," *Overton & Co. v. United States*, 5 U.S.Cust.App. 183, 187 (1914), that less than six percent flour in fish cakes was insufficient to allow classification as "vegetables with fish," *see B. Westergaard & Co. v. United States*, 19 C.C.P.A. 299, 304, 1932 WL 2218 (1932), that a chemical component be present in a "significant quantity" to render the mixture "in part of" that component, *see United States v. Cavalier Shipping Co., Inc.*, 60 C.C.P.A. 152, 478 F.2d 1256, 1258 (1973), and that dumping margins of less than 0.50 percent are to be ignored, *see Washington Red Raspberry Comm'n v. United States*, 859 F.2d 898, 902–03 (Fed.Cir.1988). We further note in passing that the corresponding section of the North American Free Trade Agreement Act includes a seven percent ad valorem de minimis exception for country-of-origin determinations. *See* HTSUS General Note 12(f) (1998) (codifying this provision of the NAFTA Act). The great weight of authority compels recognition of the principle of de minimis in this case as well.

## B

"Whether a particular activity is a de minimis deviation from a prescribed standard must, of course, be determined with reference to the purpose of the standard." *Wisconsin Dept. of Revenue*, 505 U.S. at 232, 112 S.Ct. 2447. Application of de minimis is particularly important in cases such as the one at hand, where stark, all-or-nothing operation of the statutory language would have results contrary to its underlying purposes. *See id.* at 231, 112 S.Ct. 2447. In the context of General Note 3(c)(vii), subsection 3(c)(vii)(B) operates as an enforcement provision: intended to ensure that only Canadian goods reap preferential trade benefits. The transformation requirement of 3(c)(vii)(B)(2) prevents "offshore" (non-Canadian) goods from simply passing through Canada to incur lower fees. In this way, the "tariff shift" transformation requirement of subsection 3(c)(vii)(B)(2)(I) plays its part in the overall objective of the USCFTA Act, which is, inter alia, to "reduc[e] and eliminat[e] barriers to trade [between Canada and the United States]." Pub.L. No. 100–449, § 2, 102 Stat. 1852 (1988). *See also* 19 U.S.C. § 2112 note (1994).

In contrast, Customs' proposed abandonment of the de minimis principle in this case engenders results at odds with the statutory purpose. Customs imposes a de facto trade barrier—through higher fees—on the more than 99 percent of the aluminum ingots which unquestionably meet the requirements of subsection 3(c)(vii)(B)(2)(I), in the effort to prevent the less than one percent nonqualifying ingredients from reaping a reward. This position also places form ahead of substance: because the relevant tariff shift requirement expressed in 3(c)(vii)(R) presumes that processed materials will transform to a higher degree of finish,[4] it would—if applied to the de minimis grain refiner—produce an odd result, because the grain refiner was pro-

---

4. *See, e.g.,* Customs Co–Operation Council, *Introducing the International Convention on the Harmonized Commodity Description and Coding System* 32 (1987) ("[a]s a general rule, goods are arranged in order of their degree of manufacture.... The same progression also exists within the chapters and headings").

cessed (liquified and dispersed) into a product that was at the same or lesser degree of finish. Further, because the grain refiner is 94 percent aluminum, it is classified in the same HTSUS chapter as the ingots; if instead it had been classified according to titanium and boron—its only active ingredients and the elements that the grain refiner is used to introduce—the grain refiner would have undergone the section 3(c)(vii)(B)(2)(I) tariff shift. In light of this array of contrary results, we hold that Customs' refusal to recognize the principle of de minimis in construing this section is unreasonable and contrary to law.

### C

Although Customs acknowledges the general applicability of de minimis, it contends that the principle cannot be used here because the language at issue originated in an international agreement. More particularly, Customs argues that because a treaty is construed to carry out the intent of the signatories, see Xerox Corp. v. United States, 41 F.3d 647, 652 (Fed.Cir.1994), the silence of the United States–Canada Free–Trade Agreement of 1988 ("Free–Trade Agreement") and its implementing legislation regarding de minimis must be given especially great weight. At most, according to Customs, a de minimis "exception" may only be found where the terms of the treaty are ambiguous, which, it asserts, is not the case here. While this contention was essentially accepted by the Court of International Trade, Alcan, 986 F.Supp. at 1440, we find it to be incorrect.

What this argument fails to consider is that the Court of International Trade and this court have been asked to interpret the terms of General Note 3(c)(vii)(B) of the HTSUS—a statute[5]—not the Free–Trade Agreement. The Free–Trade Agreement is not a "treaty" according to Article II of the United States Constitution and moreover has no independent effect in U.S. law. See S.Rep. No. 100–509, at 10 (1988), reprinted in 1988 U.S.C.C.A.N 2395, 2404 ("The [Free–Trade Agreement] is not self-executing and

has no independent effect under U.S. law."). There is thus a critical distinction between General Note (3)(c)(vii)(B) and the Free–Trade Agreement: the former has actual legal effect in this case; the latter does not. While, as with any legislative history, the origin of the language of General Note 3(c)(vii)(B) may well be relevant to the construction of its terms, it does not alter that we are interpreting statutory language and presents no obstacle to recognition of the de minimis principle in this case.

This conclusion is further reinforced by the observation that even if we were to interpret the terms of the USCFTA Act (and the HTSUS (1993)) according to rules regarding the construction of treaties, see, e.g., Sumitomo Shoji Am., Inc., v. Avagliano, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) (noting rules related to the construction of treaties), United States v. Stuart, 489 U.S. 353, 365–66, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (interpreting a treaty to carry out the intent of the signatories), our conclusion would be no different. Treaties are interpreted as contracts between nations, see In re The Amiable Isabella, 19 U.S. (6 Wheat.) 1, 46, 5 L.Ed. 191 (1821); as such, general rules of construction apply, including weight given the intent of the parties. See id. Just as whether a particular amount of non-"transformed" material is a de minimis deviation from a prescribed standard must be determined with reference to the purpose of the standard, see Wisconsin Dept. of Revenue, 505 U.S. at 232, 112 S.Ct. 2447, the purpose of treaty language—that is, the purpose of the signatories—guides the interpretive analysis. See, e.g., Sumitomo, 457 U.S. at 180, 102 S.Ct. 2374, Stuart, 489 U.S. at 365–66, 109 S.Ct. 1183; Maximov v. United States, 373 U.S. 49, 54, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963); The Amiable Isabella, 19 U.S. (6 Wheat.) at 46. Since plainly the signatories to the Free–Trade Agreement could not have intended that the terms of the agreement be interpreted in a way that caused the contrary and absurd results we see here, our conclusion that goods that contain over 99 percent of "transformed" materi-

---

5. The terms of the HTSUS are considered "statutory provisions of law for all purposes." Pub.L. No. 100–418, § 1204(c), 102 Stat. 1149 (1988). See also 19 U.S.C. § 1202 note (West Supp.1998).

al are "transformed" for the purposes of General Note 3(c)(vii)(B)(2)(I) would be the same under an approach based upon treaty construction principles.

We also reject Customs' assertion, and the Court of International Trade's conclusion, that the de minimis principle applies only when the statutory language is ambiguous. Certainly unclear language may offer a compelling reason for application of de minimis—where, for example, a too-rigid application of an ambiguous statutory provision would result in purposes contrary to the statute. See, e.g., Abbott Labs. v. Portland Retail Druggists Ass'n, Inc., 425 U.S. 1, 12, 18, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976) (recognizing de minimis when construing terms of the Robertson–Patman Act "broadly"). However, there was no suggestion by the Supreme Court in *Wisconsin Department of Revenue* that the terms of the statute exempting certain in-state business activities from taxation were ambiguous. Indeed, in that case the Court established that the de minimis principle applies absent indication to the contrary. See 505 U.S. at 231–32, 112 S.Ct. 2447. Therefore, we discern no reason why, in the absence of explicit language precluding application, the normal operation of the de minimis principle should be abandoned. De minimis non curat lex operates to ensure that the underlying purpose of the statutory provision is carried out, *id.* at 232, 112 S.Ct. 2447; its application and scope depends upon whether those purposes are frustrated by a rigid interpretation, not on whether the language is unclear.

### D

■ As its last line of defense, Customs argues that the grain refiner, notwithstanding its trivial quantity and cost in relation to the balance of the aluminum ingots, is not de minimis because it is "commercially significant" to the imported good. As authority, Customs cites a number of cases where courts have considered the qualitative impact of the allegedly de minimis material as well as the quantitative amount or value. See, e.g., United States v. Aceto Chem., 64 C.C.P.A. 78, 553 F.2d 685 (1977); Northam Warren Corp. v. United States, 60 C.C.P.A.

117, 475 F.2d 647 (1973); *Varsity Watch Co. v. United States,* 34 C.C.P.A. 155 (1947). A review of this authority, however, exposes the weakness in Customs' position. The disputes in the cases cited by Customs related to classification status rather than country-of-origin determinations. Because the touchstone of the de minimis analysis is the purpose of the statutory provision, *see Wisconsin Dept. of Revenue,* 505 U.S. at 232, 112 S.Ct. 2447, tariff classification and country-of-origin analyses are not equivalent. Classification is an exercise in assessing the commercial status of particular goods, while country-of-origin requirements instead seek to prevent quantities of nonoriginating goods from benefiting from preferential trade agreements. For example, while the additional salability—a qualitative measure of commercial status—afforded by adding a small amount of gold to an otherwise inexpensive watch may be critical to the classification decision, *see Varsity Watch,* 34 C.C.P.A. at 163, there is no corresponding qualitative indicia relevant to the origin of an imported good. We therefore conclude that the purposes of the country-of-origin requirements of General Note 3(c)(vii)(B)(2)(I) are best met through the application of a quantitative de minimis standard—that is, one measured by weight and value.

Here, the parties stipulated that the amount of grain refiner used in the production of the aluminum ingots was less than one percent, by weight and cost, of the total weight and cost of the imported goods. *See Alcan,* 986 F.Supp. at 1437. This clearly qualifies as de minimis: we hold that the aluminum ingots at issue do not fail the country-of-origin test established in HTSUS General Note 3(c)(vii)(B)(2)(I) (1993).

Accordingly, the judgment of the Court of International Trade is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*REVERSED AND REMANDED.*

MAYER, Chief Judge, dissenting.

While I agree with the court that the principle of *de minimis non curat lex* should be applied in this case, I must dissent from

the use of a test that considers only quantitative factors. When judging whether an ingredient in an imported good is to be considered a "small or trifling matter[ ]," *Black's Law Dictionary* 431 (6th ed.1990), the amount and value of the component is certainly relevant, but its function is meaningful as well. Therefore, I would apply the *de minimis* principle here through both qualitative and quantitative analyses.

An element that is a vital piece of a good's function cannot be described as "small or trifling," no matter its quantity. The grain refiner at issue is an excellent example. If the grain refiner itself were the imported product, it could enjoy preferential tariff status under the court's holding if its aluminum, which makes up the bulk of the refiner, were from Canada—even though its boron and titanium, which are the only ingredients that operate as a grain refiner, originate in another country. By ignoring all qualitative factors, the court would allow the only functioning components of a product to escape simply because they are included with a large amount of non-essential material. This stands the *de minimis* principle on its head.

The court is correct in recognizing the importance of a statute's purpose when applying the *de minimis* principle, *see Wisconsin Dept. of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 232, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992), but that does not militate against the need to consider qualitative measures. Moreover, although the court attempts to distinguish the country-of-origin issue here from the classification cases that use both quantitative and qualitative analyses, *see, e.g., United States v. Aceto Chem. Co.*, 64 C.C.P.A. 78, 553 F.2d 685 (1977); *Varsity Watch Co. v. United States*, 34 C.C.P.A. 155, 1947 WL 5096 (1947), the distinctions are inconsequential. Whether a good's classification or its origin is being determined, quantitative factors alone are insufficient to declare that one of its elements is *de minimis*. Only consideration of qualitative factors prevents manufacturers from skirting the purpose of trade agreements by combining the essential elements of a good with a large amount of relatively unimportant carriers.

Here, it was stipulated that the grain refiner is a minor part, by weight and cost, of the finished aluminum ingots. For those ingots in which it is used, however, the refiner appears to play a significant role in production by minimizing cracking when the molten metal is cast and then solidified. Therefore, it is not at all clear, despite the court's view to the contrary, that the non-Canadian grain refiner is a "small or trifling matter" in this imported good.