DIACHEM INDUSTRIES LTD., PLAINTIFF *v.*
UNITED STATES OF AMERICA, DEFENDANT

Court No. 96–05–01386

(Decided September 4, 1998)

*Reed Smith Shaw & McKay (James K. Kearney),* for Plaintiff.

*Frank W. Hunger,* Assistant Attorney General of the United States; *Joseph I. Liebman,* Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Bruce N. Stratvert);* Office of Associate Chief Counsel, United States Customs Service, *(Mitra Hormozi),* of counsel, for Defendant.

## OPINION

BARZILAY, *Judge:* Plaintiff, Diachem Industries Ltd. ("Diachem"), commenced this action challenging the classification of its imported merchandise by the United States Customs Service ("Customs"). This Court has jurisdiction under 28 U.S.C. § 1581(a) (1994). The parties have cross-moved for summary judgment. Based upon the papers submitted, the Court finds the following material facts are not in dispute.

## BACKGROUND

DIAQ is an aqueous dispersion of Anthraquinone and other ingredients: small amounts of DOWFAX 2A1, sodium, hexametaphosphate, xanthan gum and soda ash. *Pl.'s Stat. Mat. Facts* at ¶ 11. Anthraquinone is a separately defined organic compound and is used as a catalyst in the pulp and paper industry in kraft pulping, a step in the paper-making process. *Id.* at ¶ 3. Anthraquinone is an aromatic substance as it is a derivative of anthracene, a component of coal tar. *Pl.'s Attach. B* at ¶ 10. *See also Def's Mem. Supp. Mot. Sum. J.* at 16, n.8 *("Def's Mem.").* Anthraquinone is poorly soluble in water and it is formulated in DIAQ along with other ingredients to help sustain the Anthraquinone particles throughout the mixture. *Compl.* at ¶¶ 17, 25. Though Anthraqui-

none in solid form can be used as a catalyst by the pulp and paper industry, an aqueous dispersion such as DIAQ is easier to use because dispersions are fluid and can be transported through pipes by pumping and can be readily applied and metered. *Compl.* at ¶ 20. DIAQ is a catalytic preparation, *compl.* at ¶ 14, and a reaction accelerator. *Def.'s Stat. Addit. Mat. Facts* at ¶ 48. It is a redox (oxidation-reduction) catalyst preparation used as a reaction accelerant in kraft pulping. *Def.'s Mem.* at Ex.2 (Diachem's response, dated October 12, 1994, to U.S. Customs' Request for Information pursuant to 19 CFR 151.11, 152.2, (CF 28)). DIAQ is not a supported catalyst. *Def.'s Stat. Addit. Mat. Facts at* ¶49.

Customs classified DIAQ under subheading 3815.90.50, Harmonized Tariff Schedule of the United States ("HTSUS"), as a reaction initiator, reaction accelerator and catalytic preparation. Diachem claims that DIAQ should be classified as Anthraquinone under HTSUS 2914.61.00. For the reasons set out in the opinion which follows, the Court denies Diachem's motion for summary judgment and grants Customs' motion for summary judgment upholding its classification of the merchandise. The relevant statutes, including headnotes, are set out below.

RELEVANT STATUTES

Harmonized Tariff Schedule of the United States (1995):

*Chapter 29*

*Notes*

1. Except where the context otherwise requires, the headings of this chapter apply only to:

(a) i.Separate chemically defined organic compounds, whether or not containing impurities;

(b) Mixtures of two or more isomers of the same organic compound (whether or not containing impurities), except mixtures of acyclic hydrocarbon isomers (other than stereoisomers); whether or not saturated (Chapter 27);

(c) The products of heading 2936 to 2939 or the sugar ethers and sugar esters, and their salts, of heading 2940, or the products of heading 2941, whether or not chemically defined;

(d) Products mentioned in (a), (b) or (c) above dissolved in water;

(e) products mentioned in (a), (b) or (c) above dissolved in other solvents provided that the solution constitutes a normal and necessary method of putting up these products adopted solely for reasons of safety or for transport and that the solvent does not render the product particularly suitable for specific use rather than for general use;

(f) The products mentioned in (a), (b), (c), (d) or (e) above with an added stabilizer (including an anticaking agent) necessary for their preservation or transport;

(g) The products mentioned in (a), (b), (c), (d), (e) or (f) above with an added antidusting agent or a coloring or odoriferous substance added to facilitate their identification or for safety reasons, provided that the additions do not render the product

particularly suitable for specific use rather than for general use;

(h) The following products, diluted to standard strengths, for the production of azo dyes; diazonium salts, couplers used for these salts and diazotizable amines and their salts.

| Heading/Subheading | Article Description |
|---|---|
| 2914 | Ketones and quinones whether or not with other oxygen function, and their halogenated, sulfonated, nitrated or nitrosated derivatives; |
| * * | * * * * * |
| | Quinones: |
| 2914.61.00 | Anthraquinone |
| *Chapter 38* | |
| 3815 | Reaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included: |
| | Supported catalysts: |
| 3815.11.00 | With nickel or nickel compounds as the active substance |
| 3815.12.00 | With precious metal or precious metal compounds as the active substance. |
| 3815.19.00 | Other |
| 3815.90 | Other: |
| | Consisting wholly of inorganic substances: Of bismuth, of tungsten or of vanadium |
| 3815.90.20 | Of mercury or of molybdenum |
| 3815.19.30 | Other |
| 3815.90.50 | Other: |

CONTENTIONS OF THE PARTIES

Diachem contends that the heading "Anthraquinone" is an *eo nomine* designation and that it should be read to include all forms of the product, so long as the form bears any essential resemblance to the one described. Thus, Diachem asserts that DIAQ is a form of Anthraquinone and that it is classifiable under tariff item 2914.61.00.

Diachem admits that DIAQ is not a separate chemically defined compound or chemical solution as described in Headnotes 1(a) and (d) of Chapter 29, but claims that because DIAQ is an aqueous dispersion of Anthraquinone, an organic compound, and a liquid made up mostly of Anthraquinone, it is Anthraquinone. Diachem argues that Anthraquinone defines the essential character of DIAQ and that the minor constituents in DIAQ do not play a direct role in the principal function of Anthraquinone. Moreover, Diachem contends that the minor ingredients are not present in DIAQ in quantities sufficient to be significant for tariff purposes. Diachem also contends that Headnotes 1(d) and 1(e) to Chapter 29 require classification of DIAQ under 2914.61.00. With re-

gard to Headnote 1(d), Diachem admits that DIAQ is not a separate chemically defined compound or a chemical solution, but contends that "there is no practical distinction between dispersions and solutions because the two formulations have analogous industrial functions in providing normally solid chemicals in fluid form to facilitate the distribution of solid chemicals." *See Pl.'s Mem. Supp. Sum. J. ("Pl.'s Mem.")* at 11–12. In discussing DIAQ with regard to Headnote 1(e), Diachem argues that Anthraquinone is dispersed in water, as in DIAQ, solely *to minimize safety and health hazards and to facilitate transport and distribution.* Diachem also contends that the Anthraquinone in DIAQ remains suitable for general industrial applications and that the DIAQ dispersion does not render the Anthraquinone particularly suitable for a specific use rather than for general use.

Diachem also argues that the common and commercial meaning of Anthraquinone includes aqueous dispersions such as DIAQ. *Pl.'s Mem.* at 13. Diachem states that the pulp and paper industry purchases Anthraquinone exclusively in liquid or semi-liquid forms, not in tablet form. *Id.* at 14. In addition, DIAQ is marketed and sold as Anthraquinone, and pulp and paper industries purchase DIAQ with the understanding and expectation that they are purchasing Anthraquinone only. Thus, Diachem proposes that the more specific classification for DIAQ is found under Chapter 29 of the HTSUS rather than under Chapter 38 as determined by Customs, because the classification of Anthraquinone is more specific than the Customs' "all others" classification. *Pl.'s Mem.* at 20.

Customs argues that DIAQ is properly classified under the "all others" classification of Chapter 38 under the category of "reaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included." *See Def.'s Mem.* at 7. Customs contends that DIAQ consists of several separate chemically defined compounds, and, therefore, is not a separate chemically defined compound dissolved in either water or another solvent as described by the chapter notes of HTSUS Chapter 29. *Id.* at 9–10. Customs argues that DIAQ is not a solution, but a complex mixture. *Id.* at 12. Customs also contends that the terms "dispersion" and "solution" are not synonymous and that the legislature intended only solutions to be included in Chapter 29. *Id.* at 11–12.

Customs refutes Diachem's argument that DIAQ is properly classifiable as Anthraquinone, an *eo nomine* classification, stating that the language of the Chapter 29 notes clearly preclude classifying formulations of Anthraquinone with other ingredients in that chapter. The language specifically permits only "separate chemically defined organic compounds" to be classified in Chapter 29. Customs asserts that its classification under 3815.90.50 is appropriate because it describes what DIAQ is: a catalytic preparation. *Id.* at 15.

THE STANDARD OF REVIEW

This case is before the Court on the parties' cross motions for summary judgment. Under USCIT R. 56(d), summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Both parties posit that this case is ripe for adjudication by means of summary judgment. This Court agrees. Even though there are minor differences in the factual positions advanced by each party, summary judgment is appropriate in this action because there are no genuine issues of material fact in dispute. The parties agree on the basic details of the imported merchandise, but dispute the classification. Thus, the material facts of what the merchandise is and what it does are not at issue. *See Bausch & Lomb, Inc. v. United States,* 21 CIT 166, 957 F. Supp. 281, 284 (1997), *aff'd,* 1998 U.S. LEXIS 15175 (Fed. Cir. 1998). This Court is then left with the purely legal question involving the meaning and scope of the tariff provision and whether it includes the imported merchandise. *See National Advance Systems v. United States,* 26 F.3d 1107, 1109 (Fed. Cir. 1994).

Although there is a statutory presumption of correctness for Customs' decisions, 28 U.S.C. § 2639(a)(1) (1994), when the Court is presented with a question of law in a proper motion for summary judgment, that presumption does not apply. *Blakley Corp. v. United States,* Slip. Op. 98–94 22 CIT 635 (1998), (quoting *Universal Electronics, Inc. v. United States,* 112 F.3d 488, 492 (Fed. Cir. 1997) ("[b]ecause there was no factual dispute between the parties, the presumption of correctness is not relevant.")) *See also Goodman Manufacturing L.P. v. United States,* 69 F.3d 505, 508 (Fed. Cir. 1995).

Therefore this Court must examine both parties' claimed classifications and independently determine which of them is correct, or if neither, take further measures to determine the correct classification. 19 U.S.C. 2643(b) (1994).

DISCUSSION

In determining the meaning and scope of the tariff provision, this Court is required by the General Rules of Interpretation of the Harmonized Tariff Schedule ("GRI") to determine classification "according to the terms of the headings and any relative section or chapter notes." GRI 1. If the chapter notes and headings are dispositive, the Court need not engage in the analysis of subordinate rules and other interpretation. *See, e.g., Alcan Aluminum Corp. v. United States,* 21 CIT 1283, 986 F. Supp. 1436, 1443 (1997).

Note 1(a) to Chapter 29 provides that, "[e]xcept where the context otherwise requires, the headings of this Chapter apply only to separate

chemically defined organic compounds." The remaining portions of Note 1, respectively, provide for products mentioned in Note 1(a):

"dissolved in water," Note 1(d); or

"dissolved in other solvents provided that the solution constitutes a normal and necessary method of putting up these products adopted solely for reasons of safety or for transport and that the solvent does not render the product particularly suitable for specific use rather than for general use," Note 1(e); or

"with an added stabilizer * * * necessary for their preservation or transport," Note 1(f); or

"with an antidusting agent * * * for safety reasons" Note 1(g).

Therefore, in determining the proper classification of the imported product, DIAQ, this Court must determine, in the first instance, whether it is a separate chemically defined organic compound.

The parties agree that DIAQ is not a separate chemically defined organic compound, but Diachem argues that because the Anthraquinone in DIAQ retains its identity as a separate chemically defined compound, the product falls under the Chapter 29 designation of Anthraquinone. Diachem argues that DIAQ is known by the pulp and paper industry as Anthraquinone. As such, DIAQ should be entitled to classification as Anthraquinone under a doctrine which enunciates that if a product is generally and definitely known, bought and sold under a particular identity, it is classified as such for tariff purposes. Diachem relies upon *Aldrich Chemical Co., Inc. v. United States*, 297 F. Supp. 1389 (Cust. Ct. 1969) (classification of thioacetic acid as other acids or sulfur compounds including thiols) and *New York Merchandise Co., Inc. v. United States*, 294 F. Supp. 971 (Cust. Ct. 1969) (classification of vinyl baseball gloves as other toys or baseball equipment) for this proposition. Diachem also argues that the minor ingredients included in DIAQ do not affect the essential character of Anthraquinone because those ingredients neither chemically react with a compound nor do they enhance its catalytic properties. In support of this argument, Diachem relies upon a line of cases decided under the Tariff Schedules of the United States ("TSUS") determining what role minor ingredients play in the tariff classification of chemical products. *See, e.g., Aceto Chemical Company v. United States*, 408 F. Supp. 1389 (Cust. Ct. 1975); *Cavalier Shipping Co. v. U.S.*, 337 F. Supp. 447 (Cust. Ct. 1971).

The Court finds these arguments unpersuasive. In order to be classifiable within Chapter 29, DIAQ must satisfy the specific dictates of Chapter 29, Note 1. As constituted upon importation, DIAQ is not described by Note 1 and therefore, is precluded from classification within Chapter 29. For guidance on the meaning of Chapter 29, Note 1, this Court turns to the explanatory notes to the Harmonized Commodity Description and Coding System ("Explanatory Notes") which are "generally indicative of the proper interpretation of [the Harmonized Tariff System] * * *." *Lynteq, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir. 1992) (quoting H.R. CONF. REP. NO. 576, at 549 (1988), reprinted in 1988

U.S.C.C.A.N. 1547, 1582.) As stated in the Explanatory Notes: "[a] separate chemically defined compound is a single chemical compound of known structure which does not contain other substances deliberately added during or after its manufacture (including purification)." *Harmonized Commodity Description and Coding System, Explanatory Notes* at 326 (1st ed. 1986). The imported merchandise, DIAQ, is not a single chemical compound. It consists of several chemically defined compounds, for example: Anthraquinone, water, sodium, hexametaphosphate and soda ash. DOWFAX 2A1 and xanthan gum themselves consist of several chemically defined compounds. Therefore, DIAQ does not fit within Note 1(a).

Because DIAQ does not satisfy the criteria specified by Note 1(a), it cannot satisfy the Note 1(d) and (e) criteria. The parties have both discussed at length the meanings and legal significance of the terms "solution" and "dispersion." However, these discussions are not relevant, as it is clear that because DIAQ is not a separate chemically defined organic compound, it cannot be classified pursuant to Notes 1(d) or (e) regardless of whether, as an aqueous dispersion of Anthraquinone, it is legally or scientifically equivalent to a solution.

This Court must also reject Diachem's argument that DIAQ should be classified under the *eo nomine* provision for Anthraquinone. The Court faced a similar decision in *H. Reisman Corp. v. United States*, 17 CIT 1260, 1264 (1993). The disputed merchandise in the *Reisman* case was a vitamin B–12 animal feed preparation. *Id.* at 1260. The importer claimed that the merchandise should be classified as "other vegetable material of a kind used in animal feeding" or "other preparations of a kind used in animal feeding." *Id.* at 1260–61. Customs claimed that the merchandise should be classified under Chapter 29 of the HTSUS as vitamin B–12 because such a classification was *eo nomine*. *Id.* at 1264. The Court found that the merchandise did not fall under an *eo nomine* classification for vitamin B–12 because it did not fit into the explanatory headnotes of Chapter 29. *Id.* at 1262–64. The Court also found the merchandise was a formulation of two organic compounds (two different forms of vitamin B–12), substantial quantities of proteinaceous materials, and other substances while the explanatory headnotes identified only "separate chemically defined organic compounds," "mixtures of two or more isomers of the same organic compound," or either of the previous two products dissolved in water or other solvents. The Court concluded that the merchandise was not vitamin B–12 and that the entire chapter did not apply to the merchandise. *Id.* at 1264. The Court explained that the merchandise fell outside the scope of the chapter because it consisted of an eluate of two separate organic compounds which were derived from the manufacture of vitamin B–12. *Id.* at 1263–64. The Court declined to classify the merchandise as vitamin B–12 holding that the entire Chapter 29 was not applicable to the product. *Id.* at 1264–65.

The situation here is directly analogous. Although DIAQ contains Anthraquinone, it cannot be classified under Chapter 29 because the product is not a separate chemically defined organic compound in its condition as imported. Here, the presence of the other materials: DOW-FAX 2A1, hexametaphosphate, xanthan gum and soda ash, each in themselves separate chemically defined organic compounds, precludes classification of DIAQ as Anthraquinone. Therefore, DIAQ is not classifiable within Chapter 29 of the Harmonized Tariff Schedules.

This Court next turns to an examination of Customs' classification of DIAQ within heading 3815 HTSUS at subheading 3815.90.50. Heading 3815 describes reaction initiators, reaction accelerators and catalytic preparations not elsewhere specified or included. In our previous analysis on Chapter 29, we noted that we must consider the General Rules of Interpretation and GRI 1. GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes * * *." There are no applicable Chapter 38 section or chapter notes precluding classification of DIAQ within 3815. Even though Chapter 38, Note 1(a) precludes classification within Chapter 38 of separate chemically defined compounds, because DIAQ is not a separate chemically defined compound, Note 1(a) cannot govern its classification.

Subheading 3815.90.50, HTSUS describes: "Reaction initiators, reaction accelerators and catalytic preparations, not elsewhere specified or included: Supported catalysts: * * * Other: * * * Other." The terms of subheading 3815.90.50 specifically provide for reaction accelerators and catalytic preparations. As a catalytic preparation and reaction accelerator, DIAQ performs the functions of articles described in subheading 3815.90.50.

The Explanatory Notes to heading 3815 provide further support that DIAQ is properly classifiable under subheading 3815.90.50. These notes state that heading 3815 covers preparations which initiate or accelerate certain chemical processes including free radical catalysts (e.g., organic solutions of redox mixtures). *See Explanatory Notes* at 537. As noted in the finding of material facts, Diachem's own descriptive literature states that DIAQ is a redox (oxidation-reduction) catalyst preparation used as a reaction accelerant in kraft pulping.

In addition, DIAQ is described within subheading 3815.90.50 inasmuch as it is not a "supported catalyst," within the meaning of subheadings 3815.11.00, 3815.12.00, and 3815.19.00. *See Explanatory Notes* at 537 (defining the term "supported catalyst."[1]) DIAQ is also precluded from classification in subheadings 3815.90.10, 3815.90.20 and 3815.90.30 because it contains Anthraquinone, an organic compound,

---

[1] [c]omposed either of one or more active substances deposited on a support * * * or of mixtures with a basis of active substances. In the majority of cases, these active substances are certain metals, metallic oxides, other metallic compounds or mixtures thereof. The metals most frequently used as such or as compounds are cobalt, nickel, palladium, platinum, molybdenum, chromium, copper or zinc. The support, sometimes activated, generally consists of alumina, carbon, silica gel, siliceous fossil meal or ceramic materials. Examples of supported 'catalysts' are supported Ziegler or Ziegler-Natta types.

so DIAQ does not "consist[] wholly of inorganic substances" as is descriptive of the products included within those subheadings.

Alternatively, in its complaint (but not advanced in its summary judgment motion), Diachem claims that DIAQ is classifiable within subheading 3809.92.50. That claim cannot be sustained. Subheading 3809.92.50, by its terms, covers products which do not contain 5 percent or more by weight of aromatic substances. Inasmuch as DIAQ contains more than 5 percent by weight of Anthraquinone, and Anthraquinone is an aromatic substance, DIAQ is not classifiable within subheading 3809.92.50. DIAQ, therefore, is described within heading 3815, inasmuch as it satisfies the terms of that heading, and it is not elsewhere specified or included.

## CONCLUSION

Therefore, the Court rules that U.S. Customs correctly classified the imported merchandise, DIAQ, under the subheading 3815.90.50, HTSUS.