**CAVALIER SHIPPING CO., Inc.**

v.

**UNITED STATES.**

C.D. 4317; Protest Nos. 67/61619–2583, etc., against the decision of the district director of customs at the port of Norfolk.

United States Customs Court,
First Division.

Dec. 30, 1971.

George Bronz, Washington, D. C., for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Herbert P. Larsen, New York City, trial attorney), for defendant.

Before WATSON, MALETZ and RE, Judges.

WATSON, Judge:

These protests, consolidated for the purpose of trial, place in issue the classification of certain importations of methyl bromide manufactured in Israel and imported into the United States in 1965 and 1966.

We note before commencing that the entry which is the subject of protest 67/61624, was liquidated less than 60 days after appraisement. With regard to the jurisdictional problem raised by this procedure, we continue to adhere to the position taken in John V. Carr & Son, Inc. v. United States, 66 Cust.Ct. 316, C.D. 4209, 326 F.Supp. 973 (1971), and consider the liquidation valid and the protest based thereon timely.

The importations were classified under item 405.15 of the TSUS providing for "products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part", and assessed with duty as pesticides pursuant to item 405.15 dutiable at the rate of 3.5 cents per pound plus 25 percent ad valorem.

Plaintiff claims classification pursuant to item 429.48 of the TSUS as other halogenated hydrocarbons, dutiable at the rate of 10.5 per centum ad valorem.

Defendant has advanced an alternative claim for classification pursuant to item 409.00 of the TSUS as "mixtures in whole or in part of any of the products provided for in this subpart".

The following stipulation was entered into by the parties:

1. The imported merchandise is a liquid under pressure composed of methyl bromide (68.6%), petroleum hydrocarbons (30.0%) and chloropicrin (1.4%) except in those instances where the merchandise is entered in small cans in which case they were composed of methyl bromide (98%) and chloropicrin (2%).

2. Its uses are those comprised within the term "pesticide," as defined in TSUS schedule 4, part 1, subpart C, headnote 2.

3. The petroleum hydrocarbons serve only as a diluent and/or propellant, are not an active pesticidal ingredient.

4. In these importations, the chloropicrin is used in this formulation as a warning agent to alert people by its pervasive, unpleasant aroma, in the event of leakage of the methyl bromide, which is poisonous.

5.[1]

6. Methyl bromide is a halogenated hydrocarbon, but not one described in any of the TSUS items 429.20–429.47, inclusive.

The above stipulation sets forth the relevant facts in this case. The testimony of the witnesses and the various exhibits support the outline of the basic facts set out above.

The basic issue between the parties centers on the consequence of the appearance of chloropicrin in the importations to the extent of 1.4 to 2 percent. Although chloropicrin can be manufactured or derived from non-benzenoid source material, no proof on this question was adduced and consequently the presumption is in effect that it is de-

---

[1]. A stipulation numbered 5 relating to the origin of the chloropicrin could not be maintained by the parties. Nevertheless, as will become clear in the text of the decision, the presumption is that the chloropicrin in question was of benzenoid origin.

rived from benzenoid origin. The defendant contends that the presence of this chloropicrin is sufficient to bring the article of which it is an ingredient within the ambit of the portion of the chemical schedules dealing with products or mixtures in part of ingredients which are benzenoid in origin.

Plaintiff argues that the small quantity of chloropicrin involved is insufficient to justify the classification of the importation in the provision for benzenoid chemicals and that the importation is more properly classifiable under the provision for halogenated hydrocarbon in item 429.48.

It is clear from the stipulation and the testimony herein that the purpose of the chloropicrin herein is solely to warn the user of the pesticide of any leakages of the potentially lethal methyl bromide. The users of the importations are primarily farmers and others who are not specialists in the skilled use of pesticides. This appears to be the practice with domestically produced methyl bromide intended for a similar application or usage.

■ We grant that minute quantities can have bearing on the classification of importations but hold that this should only be the case when these substances are playing a "substantial" part. In the tariff context, that word means of a magnitude which constitutes it a factor in the primary function of the whole. Thus, in Northam Warren Corp., Alltransport, Inc., et al. v. United States, 65 Cust.Ct. 584, C.D. 4142 (1970) (appeal pending), a minute (0.15%) portion of a coal tar derivative ingredient which performed a brightening function in a pigment, was sufficient to make that pigment a mixture "in part" of a product provided for in paragraph 27(a) (1) of the Tariff Act of 1930, as modified by T.D. 52739. In that decision we emphasized that "the coal tar derivative ingredient performed a function affecting the appearance of a product whose appearance is part of its functional role * * *." By this we attempted to dis-

tinguish that fact situation from the fact situation in the case of E. Fougera & Co. v. United States, 49 Treas.Dec. 986, T.D. 41632 (1926), and in effect point out that one harmonious legal approach was taken in both cases.

In E. Fougera & Co. v. United States, *supra,* this court found that the presence of minute quantities of salicylic acid (a coal tar derivative and non-medicinal preservative) in certain medicinal preparations, did not make those preparations dutiable as "products obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 * * *" even though salicylic acid is specifically named in said paragraph 27. The court found a general purpose "to insure that paragraphs 27 and 28 should certainly cover all intermediate and finished coal tars * * * and to avoid loopholes and not to drag what are substantially noncoaltar articles into paragraph 27 or 28." The court reasoned further as follows:

It seems to us that the words, "in part," used in the expression "when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27" must be read in the light of the general purpose above expressed. In other words, if the purpose of taxing at higher rates coal tar and similar or synthetic products is not accomplished by holding these articles dutiable under paragraph 28, then the general congressional purpose will be met by leaving them properly classified under paragraph 5. "In part" (although of course less than in whole) must mean "in substantial part," so as not to let in substantial quantities of salicylic acid at a lower rate of duty than intended for that substance in paragraph 27 if nonmedicinal, or in paragraph 28 if medicinal.

* * * * * *

By analogy the words "in part" must be held to refer to a substantial part in a commercial sense, so that a substantial quantity of salicylic acid, by being part of something else or

used in the manufacture of something else, in that way would not escape the high rates of paragraphs 27 and 28.

■ The high, protective tariff rates of paragraphs 27 and 28, have been continued in part 1 of the chemicals schedules of the Tariff Schedules of the United States. The coal tar products have been grouped in part 1 due to what the Tariff Commission referred to as their "special tariff status".[2] Most importantly the language "in whole or in part" has been continued, indicative to us of a congressional intent to seek out meaningful quantities of coal tar derivatives whether or not they constitute the predominant ingredient of importations. The thrust of this language, viewed as part of a general statutory plan, is to emphasize that quantities constituting less than the dominant quantity will still bring an article under the purview of the "benzenoid" section of the TSUS. This is not the same as reading the phrase to mean that any quantity of a benzenoid ingredient is sufficient to warrant the tariff treatment of the importation as being "in part" of a benzenoid ingredient. The latter interpretation leads to an unbalanced fixation on the ingredient of benzenoid origin at the expense of a statutory scheme much more realistic in its scope and application. A phrase intended simply to indicate a provision's sway over less than total quantities, should not be automatically applied to assert dominance over importations containing insubstantial quantities.

The courts have developed two complementary approaches to deal with the question of what quantity makes an importation "in part" of a given substance or material; a quantitative and a functional approach.

■ The E. Fougera & Co. case relied primarily on a quantitative approach, namely, the coal tar derivative ingredient was not present in sufficient quantity to consider it as coming within the ambit of a provision intended to govern meaningful or substantial quantities. In the Northam Warren case, we developed an exception implicit in E. Fougera, that a minute quantity which performs a useful function connected to the primary function of the entire article can still control the classification of the entire article. This leads to our present position that the provision for products in part of benzenoid origin will govern an article which contains any amount of a benzenoid ingredient which plays a part in the article's principal function or an article containing a benzenoid ingredient which does not play a part in the article's principal function but is nevertheless present in commercially meaningful quantities.

The principal function of the importation herein is as a pesticide. The chloropicrin in the importation does not serve a pesticidal purpose nor is it present in quantities which would warrant considering it a meaningful importation of material of benzenoid origin. It follows that neither the functional test nor the quantitative test justifies the classification of the importation on the basis of the chloropicrin being of benzenoid origin.

We find support for the view set out above in the decision of the Court of Customs and Patent Appeals in Rettinger Raincoat Mfg. Co. v. United States, C.A.D. 989, 427 F.2d 1258, 57 CCPA 119 (1970). There, raincoats containing approximately 4 percent of free carbon as a pigment were held not to be articles composed "in part" of carbon. Our appellate tribunal, in addition to remarking on the disparity this produced between the tariff treatment of black raincoats and those of other colors and the small likelihood that this would comport with congressional intent, also touched on an approach in which something more is demanded of the ingredient in question than its mere presence for a subsidiary purpose.

2. Tariff Classification Study, Schedule 4, Explanatory Notes, page 2.

Furthermore, paragraph 216 uses the language " * * * articles or wares composed wholly or in part of * * *". The term "composed of" has been held to mean "made of" or "manufactured from" or "manufactured of", United States v. Accurate Millinery Co., 42 CCPA 229, C.A.D. 599. We are confident that Congress would not have used the words "composed of" if it had intended to encompass in this provision articles in which carbon served only as a coloring agent.

The case of Varsity Watch Co. v. United States, 34 CCPA 155, C.A.D. 359 (1947), is not inconsistent with the results herein. In that case the tariff classification of watchcases was determined by an extremely small amount of gold plating and they were held to be properly classifiable as cases "in part of gold". Since this minute quantity of gold would not appear to meet either our quantitative or functional criteria, it might appear at first blush that it ought not to have been determinative of the classification. In fact, however, it is the different statutory context which accounts for the different results. In Varsity Watch Co. v. United States, the principal competing provisions were closely related subsections of one paragraph, one claimed by plaintiff for cases of base metal "(and not containing gold * * *)" and the one under which the importation was classified for cases " * * * in part of gold * * *". Read together these competing provisions could only work a complete exclusion of gold from one and a consequent complete inclusion of gold in the other. This is far different from the present situation where there is no specific exclusion of the disputed ingredient in the claimed provision, no intimate balance between it and the classified provision and where the classified provision is consequently open to a more flexible interpretation.

For the above reasons, we were careful in the *Northam Warren* case to cite *Varsity Watch Co.* only to support the proposition that the element of intent in the use of the minute ingredient plays a role in deciding whether that ingredient should control the classification and not for the proposition that if the minute ingredient participates in the primary function of the article it can control the classification. On the latter point, the statutory language therein presented too special a case to apply to the provisions for coal tar derivatives.

■ For the reasons set forth above, we are of the opinion that the quantity of chloropicrin in the importations should not determine their classification by bringing them under the sway of the provisions for products manufactured in part of materials of benzenoid origin.

■ Defendant has advanced an alternate claim for classification, still within the part for benzenoid chemicals but under the less specific language of item 409.00 providing for "mixtures in whole or in part of any of the products provided for in this subpart". We assume for the purpose of discussing this claim, that the underlying presumption regarding the benzenoid origin of the chloropicrin remains in effect for its alternate claim in the related provision. See, United States v. New York Merchandise Co., Inc., 58 CCPA 53, C.A.D. 1004 (1970). Even if that is the case, the same considerations which led us to deny controlling effect to the presence of chloropicrin in our discussion of the provision for products manufactured in part of material of benzenoid origin are valid with regard to a provision for mixtures in part of products of benzenoid origin. An ingredient of benzenoid origin, which does not play a part in the principal function of the mixture and is not present in commercially meaningful quantities, does not make the mixture one which is within the intended scope of the above provision for mixtures.

■ In this respect we find the situation herein, where an ingredient is added to make a product's use safe, close to that in which an ingredient is added for

safety of transportation and analogous to that in which ingredients are added as preservatives or to bind together other ingredients. In such cases the additional ingredient may well be disregarded for tariff purposes. Thus, in United States v. Aetna Explosives Co., 256 U.S. 402, 41 S.Ct. 513, 65 L.Ed. 1013 (1921), the addition of sulphuric acid to a shipment of nitric acid to render the latter non-injurious to steel shipping tanks, did not make the shipment a mixture for tariff purposes. Similarly, in Collin & Gissel v. United States, 12 Cust.Ct. 188, C.D. 851 (1944), the presence of 4.3 percent calcium sulphate acting as a preservative for ferrous sulphate did not justify a classification of the importation as a mixture. See also, Frances P. Wilcon v. United States, 22 Cust.Ct. 262, Abs. 52941 (1949), a rehearing of Same v. Same, 21 Cust.Ct. 38, C.D. 1123 (1948), in which the presence of potato starch solely as a binding substance in the amount of 9.4 percent in frozen codfish cakes was not sufficient to make the importation a mixture of fish and vegetables for tariff purposes.

In conclusion, we find that the importations herein are properly classifiable as halogenated hydrocarbons pursuant to item 429.48 of the TSUS dutiable at the rate of 10.5 percent ad valorem. This is the provision which most accurately describes the importation. We consider this finding best effectuates the basic tariff intention to assess duty on importations in keeping with their predominant nature at the same time as it gives to the special provisions governing such importations as are of benzenoid origin adequate sway within their prescribed areas.

In light of the above holding, we do not reach plaintiff's contentions that an established and uniform customs practice was in effect regarding the classification of the importation which could not be changed without proper notice.

Judgment will issue accordingly.