The UNITED STATES, Appellant,

v.

CAVALIER SHIPPING CO., INC.,
Appellee.

Customs Appeal No. 5502.

United States Court of Customs
and Patent Appeals.

June 7, 1973.

Harlington Wood, Jr., Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Herbert P. Larsen, New York City, for the United States.

George Bronz, Washington, D. C., attorney of record, for appellee.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and ALMOND, Senior Judge.

MARKEY, Chief Judge.

This appeal is from the decision and judgment of the United States Customs Court, First Div., 67 Cust.Ct. 440, C.D. 4317, 337 F.Supp. 447 (1971), sustaining eight consolidated protests against the classification of certain importations from Israel of methyl bromide containing 2% chloropicrin under item 405.15 of the TSUS as pesticides "obtained, derived, or manufactured * * * in part" from a benzenoid product provided for by subpart A or B of Part 1 of Schedule 4. The merchandise was held properly classifiable as other halogenated hydrocarbons under item 429.48, the claimed classification. We affirm.

The following stipulation sets forth the salient facts:

1. The imported merchandise is a liquid under pressure composed of methyl bromide (68.6%), petroleum hydrocarbons (30.0%) and chloropicrin (1.4%) except in those instances where the merchandise is entered in small cans in which case they were composed of methyl bromide (98%) and chloropicrin (2%).

2. Its uses are those comprised within the term "pesticide," as defined in TSUS schedule 4, part 1, subpart C, headnote 2.

3. The petroleum hydrocarbons serve only as a diluent and/or propellant, are not an active pesticidal ingredient.

4. In these importations, the chloropicrin is used in this formulation as a warning agent to alert people by its pervasive, unpleasant aroma, in the event of leakage of the methyl bromide, which is poisonous.

5. * * *

6. Methyl bromide is a halogenated hydrocarbon, but not one described in any of the TSUS items 429.20–429.47, inclusive.

Stipulation 5 relating to the origin of the chloropicrin was stricken at trial. But the presumption that the chloropicrin involved was of benzenoid origin has not been disputed, appellee having offered no proof as to the actual derivation. Thus the chloropicrin falls within the scope of subpart A or B of Schedule 4, Part 1. The record also establishes that chloropicrin is capable in itself of serving as a pesticide but not in concentrations as low as 1 or 2%.

Appellant's basic contention is that the presence of the chloropicrin cannot be ignored in the classification of the methyl bromide products. It is urged that the Customs Court committed reversible error in treating the merchandise as if it were a single compound. Proper recognition of the presence of the benzenoid component in the mixtures is said to require classification under the original classification, item 405.15 or, alternatively, under 409.00 as "mixtures * * * in part of" a benzenoid pesticide product provided for in subpart C of Schedule 4, Part 1.

The Customs Court agreed that minute quantities of a substance could have a bearing on classification, but added that "this should only be the case when these substances are playing a 'substantial' part." A two-sided test encompassing both a quantitative and a functional approach was set forth as the guide for determining whether the presence of a particular component makes the impor-

tation "in part" of that material. Adapting the test to this case, the court took the position that

> * * * the provision for products in part of benzenoid origin will govern an article which contains any amount of a beneznoid [sic] ingredient which plays a part in the article's principal function or an article containing a benzenoid ingredient which does not play a part in the article's principal function but is nevertheless present in commercially meaningful quantities.

The court went on to point out that the principal function of the importation was as a pesticide while the chloropicrin in the small quantities employed herein served only as a warning agent. Accordingly it concluded:

> The chloropicrin in the importation does not serve a pesticidal purpose nor is it present in quantities which would warrant considering it a meaningful importation of material of benzenoid origin. It follows that neither the functional test nor the quantitative test justifies the classification of the importation on the basis of the chloropicrin being of benzenoid origin.

The alternative classification was dismissed under analogous reasoning, the court stating:

> An ingredient of benzenoid origin, which does not play a part in the principal function of the mixture and is not present in commercially meaningful quantities, does not make the mixture one which is within the intended scope of the above provision for mixtures.

Cases wherein an ingredient added solely for safety of transportation or as a preservative or binder was disregarded for tariff purposes were also cited as support for ignoring the chloropicrin component of the mixtures.

Appellant contends that the Customs Court should have recognized that a statutory definition exists for the language "in part of," rendering the functional-quantitative test based on case law improper and unnecessary. We agree that General Headnote 9(f)(iv) defines "in part of" as containing "a *significant* quantity of the named material," with the *de minimus* rule being applicable. The interpretation, however, of "significant" and the determination of the corresponding scope of the *de minimus* exception remain open.

Appellant urges that headnotes 2 and 3 to Schedule 4 [1] are sufficient to make clear the meaning of *de minimus* with regard to the specific area of chemical compounds and mixtures. It is true that only impurities are positively excluded in headnote 2(a). But we cannot agree that such impurities represent the full extent of the *de minimus* exception insofar as "mixtures" defined in Headnote 3 are concerned and that the general statutory plan permits no further qualifications as to "significant" quantities of a mixture component. Although a basic Congressional intent to assess mixtures at the highest rate applicable to any component material is evident from a review of Schedule 4, this does not nullify the requirement that a component be present in a "significant quantity" to render the mixture "in part of" that component. Such a limitation

---

1. The relevant portions read:

2. (a) * * * The presence of impurities which occur naturally or as an incident to production does not in itself affect the classification of a product as a compound.

3. (a) The term "mixtures", as used in this schedule, means substances consisting of two or more ingredients (i. e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i. e., brought about by mechanical, physical, or chemical means), which do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual chemical properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

is in full accord with the statement in the Tariff Classification Study, Submitting Report, November 15, 1960, Vol. I at 14, that where the term "in part of" is used in the new schedules the "intention is that the component material be present in commercially significant amount."

The real issue, therefore, lies in whether the chloropicrin component of the present importations was in fact present in "commercially significant amount." Appellant strongly contends that this intentionally admixed ingredient, which serves a useful purpose, cannot properly be disregarded.

We find no error in the dual test employed by the Customs Court to determine whether the methyl bromide mixtures were to be considered "in part of" chloropicrin for tariff purposes. The quantitative approach was set forth in E. Fougera & Co. v. United States, 49 Treas.Dec. 986, C.D. 41632 (1926), wherein "in part" was equated with "a substantial part in a commercial sense." The factual distinction drawn by the Customs Court in Northam Warren Corp. v. United States, 65 Cust.Ct. 584, C.D. 4142 (1970), that the minute quantity of coal tar derivative in *Fougera* did not participate in the primary functional role, has been approved by this court. Id. v. Id., No. 5455, 475 F.2d 647, 60 CCPA ——, C.A.D. 1092 (1973). From this arises the exception for quantitatively insignificant amounts which nonetheless are present in sufficient quantity to perform a part in the primary function of the article. It is true both tests were developed in the interpretation of early tariff schedules. In view of the continuation of the language "in part" in the TSUS and the previously mentioned intention as to its import, however, this dual approach remains viable.

■ The only remaining question is whether the Customs Court erred in disregarding the chloropicrin on the importation here involved, on the basis of this quantitative-functional test. No argument has been made that the 1.4–2% of this ingredient is quantitatively significant. Instead it is stressed that the ingredient has been intentionally added for a specific purpose.

It is agreed, however, that the *primary* function of the merchandise is to act as a pesticide. The function of the chloropicrin in these importations, on the other hand, is to act as a warning agent. Appellant's own witness acknowledged that a 2% concentration of chloropicrin would only function as a warning agent and that "probably about 15 per cent" would be necessary to improve the pesticidal efficiency of the mixture. Thus we must agree with the holding of the Customs Court that methyl bromide compositions wherein the chloropicrin ingredient is not pesticidally active are not properly classified under 405.15 as a pesticide "obtained, derived or manufactured * * * in part" from a benzenoid ingredient or under 409.00 as a mixture "in part of" a benzenoid pesticide product. The chloropicrin falls within the scope of the *de minimus* exception for tariff purposes. Classification of the merchandise under item 429.48 on the basis of its methyl bromide content is more in line with the Congressional intent with respect to "in part" provisions of the TSUS.

■ Appellant additionally argues that the governing headnotes of Schedule 4 create a specific exclusion of all benzenoid chemicals from item 429.48 in the same manner as in the case of Varsity Watch Co. v. United States, 34 CCPA 155, C.A.D. 359 (1947), aff'g Id. v. Id., 17 Cust.Ct. 24, C.D. 1015 (1946). In *Varsity Watch* this court determined that it was the Congressional intention that all metallic watch cases be embraced within paragraph 367(f) of the Tariff Act of 1930 and that any purposeful inclusion of gold, regardless of the quantity, necessitated classification under a higher duty rate as being "in part of" gold rather than as "not containing gold." In the present situation the benzenoid provisions with their high

protective rates also preclude classification elsewhere, if the product is described therein. But we cannot reconcile the expressed intention with respect to the meaning of "in part" in the TSUS with the restricted concept that any purposeful addition of a benzenoid product, be it to preserve life or to enhance salability, must render the article "in part" of that product. The distinction previously drawn on the basis of the primary functional role of the merchandise better satisfies that which we consider to be the true intent of the language of the TSUS.

The decision and judgment of the Customs Court is affirmed.