Slip Op. No. 06-118

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| RHODIA, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Timothy C. Stanceu, Judge <br><br> Court No. 00-00174 |

## OPINION

[Granting plaintiff's motion for summary judgment on tariff classification of imported good consisting in part of various rare earth carbonates and denying defendant's cross-motion for summary judgment]

Dated: July 28, 2006

*Neville Peterson LLP* (*John M. Peterson* and *Curtis W. Knauss*) for plaintiff.

*Peter D. Keisler*, Assistant Attorney General, *Barbara S. Williams*, Attorney-in-Charge, International Trade Field Office, and *Bruce N. Stratvert*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant.

Stanceu, Judge: Plaintiff Rhodia, Inc. ("Rhodia") challenges the determination of tariff classification that the United States Customs Service ("Customs")[1] applied in 1999 to two entries of an imported product identified by plaintiff as "rare earth carbonate mixture" and moves for summary judgment. Defendant United States cross-moves for summary judgment. The court, exercising jurisdiction under 28 U.S.C. § 1581(a) (2000), grants summary judgment to plaintiff

---

[1] The United States Customs Service since has been renamed as the United States Bureau of Customs and Border Protection. *See* Homeland Security Act of 2002, Pub. L. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002); Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 4 (2003).

because there are no genuine issues of fact material to the tariff classification issue presented by this case and because the classification claimed by plaintiff before the court is correct.

## I. BACKGROUND

Customs, upon liquidating the two entries, classified the imported product as a cerium compound in subheading 2846.10.00 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1999) ("Compounds, inorganic or organic, of rare-earth metals, of yttrium or of scandium, or of mixtures of these metals: Cerium compounds"), subject to duty at 5.5 percent *ad valorem*. In a separate protest filed on each of the two liquidations, plaintiff asserted that the imported good is not described by the term "cerium compounds" as used in subheading 2846.10.00 and claimed classification in a "basket" subheading of heading 2846, subheading 2846.90.80, HTSUS (1999). Although Customs denied the protests, defendant United States now claims in its cross-motion for summary judgment that subheading 2846.90.80, HTSUS is the correct classification for the good. At the time of entry in 1999, that tariff provision read in pertinent part as follows:

> 2846 Compounds, inorganic or organic, of rare-earth metals, of yttrium or of scandium, or of mixtures of these metals:
>
> \* \* \*
> 2846.90.80 Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.7%.

Before the court, Rhodia claims classification in subheading 3824.90.39, HTSUS (1999). In pertinent part, that tariff provision, as of the date of entry, was as follows:

> 3824 . . . chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included . . .
>
> 3824.90 Other:

\*        \*        \*

Mixtures of two or more inorganic compounds:

3824.90.39     Other: . . . . . . . . . . . . . . . . . . . . . . Free.

## II.  DISCUSSION

The court proceeds *de novo* in actions brought to contest the denial of a protest under section 515 of the Tariff Act of 1930.  *See* 28 U.S.C. § 2640(a)(1) (2000).  Summary judgment is appropriate when the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  USCIT R. 56(c).  Where tariff classification is at issue, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).

Plaintiff has the burden of establishing that the government's classification of the product was incorrect but does not bear the burden of establishing the correct tariff classification; instead, the correct tariff classification is to be determined by the court.  *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).  In determining the correct tariff classification, the court first must "ascertain[] the proper meaning of specific terms in the tariff provision." *David W. Shenk & Co. v. United States*, 21 CIT 284, 286, 960 F. Supp. 363, 365 (1997).  That meaning is a question of law.  *See Russell Stadelman & Co. v. United States*, 23 CIT 1036, 1037-38, 83 F. Supp. 2d 1356, 1358 (1999), *aff'd*, 242 F.3d 1044 (Fed. Cir. 2001).  Second, the court is to determine the tariff provision under which the subject merchandise is properly classified.  *See Bausch & Lomb,* 148 F.3d at 1365-66.  This determination also is a question of law.  *Id*. at 1366.  The statutory presumption of correctness given Customs classification decisions by 28 U.S.C.

§ 2639(a)(1) does not apply if the court is presented with a question of law by a proper motion for summary judgment. *See Universal Elecs., Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997).

The General Rules of Interpretation of the HTSUS govern the determination of tariff classification. *N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001). General Rule of Interpretation ("GRI") 1, HTSUS, initially requires that tariff classification "be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. GRIs 2 through 4 then apply "provided such headings or notes do not otherwise require." *Id*.

For guidance as to the scope and meaning of tariff terms, the court may resort to the Explanatory Notes to the Harmonized Commodity Description and Coding System ("Explanatory Notes"), which, although not part of U.S. law, are "indicative of proper interpretation" of the tariff schedule. *Lynteq, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir. 1992) (quoting H.R. Conf. Rep. No. 100-576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582) (internal quotation marks omitted).

### A. Absence of a Genuine Issue of Material Fact

The court finds that there is no genuine issue of fact material to the tariff classification of the imported merchandise. The good, a product of the People's Republic of China, is a mixture that consists principally of various rare earth carbonates, which collectively comprise by weight 62 percent of the product. *Pl.'s R. 56 Statement of Material Facts Not in Dispute* ¶ 9. In addition to the rare earth carbonates, the product contains rare earth ammonium double sulfates,

bound water, and impurities.[2]  *Id.*  According to plaintiff, the bound water assists in the transport of the product by allowing it to flow and thereby be pumped.  *Tr. of Aug. 10, 2005 Oral Argument* at 11 ("*Tr.*").

The parties agree that the imported merchandise was produced by subjecting bastnasite ore to processing that includes crushing, grinding, treatment with sulfuric acid, and cracking in a kiln, resulting in a product that Rhodia identified as "Rare Earth crude" in a submission to Customs during the protest proceeding.  *Def.'s Resp. to Pl.'s Statement of Material Facts Not in Issue* ¶ 12 & Ex. A at 2.  The Rare Earth crude is further processed into sulfate solution, precipitated, and filtered to yield the imported good, to which Rhodia's submission in the protest proceeding referred as "mixed Rare Earth carbonate."  *Id.* ¶ 13 & Ex. A at 2.  Following importation, the product is further processed to extract rare earth carbonates.

The parties also agree that the rare earth carbonates in the mixture have commercial value.  The record made before the court, however, does not establish whether the rare earth ammonium double sulfates in the mixture have commercial value.  Plaintiff concedes that the rare earth ammonium double sulfates "may have no separate commercial value."  *Tr.* at 18.  Because the effect of the presence of the rare earth ammonium double sulfates on the determination of tariff classification would be the same whether or not the rare earth ammonium double sulfates have commercial value, as discussed *infra*, the court concludes that the issue of

---

[2] The various rare earth carbonates present are cerium carbonate (31 percent), lanthanum carbonate (18 percent), neodymium carbonate (9 percent), praseodymium carbonate (3 percent), and other rare earth carbonates (1 percent).  The remaining 38 percent of the product consists of rare earth ammonium double sulfates (4 percent), bound water (32 percent), and impurities (2 percent).  Defendant characterizes the impurities as including the rare earth ammonium double sulfates (*i.e.*, defendant characterizes the product as consisting of 6 percent total impurities).

the commercial value of the rare earth ammonium double sulfates is not a genuine issue of material fact for purposes of Rule 56.

The court concludes, similarly, that the issue of whether the rare earth ammonium double sulfates are "by-products" or "impurities" is not an issue of material fact precluding summary judgment. Defendant submitted in support of its cross-motion for summary judgment an affidavit of Mr. Larry D. Fluty, Director of Scientific Services, U.S. Customs and Border Protection, in which Mr. Fluty stated that "[t]he rare-earth ammonium double sulfates that make up 4 percent of the imported merchandise are by-products (impurities)." *Decl. of Larry D. Fluty* ¶ 12 ("*Fluty Aff.*"). His affidavit further stated that the rare earth ammonium double sulfates "are the result of the processing of the rare-earth crude into sulfate solution and then precipitation as the mixed rare-earth carbonate. As such, they are allowed impurities pursuant to Note 1(a) to Chapter 28." *Id.*

Defendant, based in part on Mr. Fluty's affidavit, maintained in its submissions in support of summary judgment that the rare earth ammonium double sulfates, which comprise 4 percent of the good by weight, should be considered an impurity or by-product for purposes of Note 1(a) to Chapter 28, HTSUS, and, therefore, do not result in the exclusion of the product from Chapter 28. *Def.'s Mem. in Supp. of its Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J.* at 7. Plaintiff does not contest the point made in Mr. Fluty's affidavit that the rare earth ammonium double sulfates resulted from the processing of the rare earth crude into sulfate solution and subsequent precipitation. Mr. Fluty's further statement to the effect that the rare earth ammonium double sulfates "are allowed impurities pursuant to Note 1(a) to Chapter 28," however, is not an assertion of fact but a conclusion of law that is based on Mr. Fluty's own

construction of that tariff provision. *Fluty Aff.* ¶ 12. The construction of Note 1(a) to Chapter 28 is an issue of law to be determined by the court. For reasons discussed *infra*, Mr. Fluty's construction of Note 1(a) to Chapter 28, HTSUS, which defendant adopts in its argument on cross-motion for summary judgment, is an impermissible one.

Finally, defendant, at a late stage of the summary judgment proceedings, appears to have attempted to raise an issue of fact pertaining to the composition of the imported good and, specifically, to whether the good actually contains rare earth ammonium double sulfates. *See Def.'s Br. Addressing the Court's Questions of Sept. 7, 2005* at 1. Here also, the court finds no genuine issue of material fact for purposes of USCIT R. 56. Defendant, having previously taken issue with plaintiff's description of the good as a "rare earth carbonate mixture," stated in its submission in response to questions of the court following oral argument that defendant "is not certain whether the merchandise imported in the entries in issue is indeed a mixture of compounds because the merchandise is described on the commercial invoices as a 'mixed rare earth carbonate' . . . ." *Id.* Defendant's response further stated that

> [t]his description appears to indicate that there is only one carbonate compound consisting of a variety of rare earths. Without a laboratory report on the analysis of the composition that make [*sic*] up the imported merchandise, defendant is unable to ascertain whether the imported merchandise consists of a mixture of different rare earth carbonates as well as, on an as-is basis, 4 percent by weight of various rare earth ammonium double sulfates.

*Id.*

Earlier, in its response to plaintiff's statement of material facts not in dispute that it filed under USCIT R. 56(h), defendant admitted that the imported good contains various rare earth carbonate compounds and also contains rare earth ammonium double sulfates, further admitting

that the rare earth ammonium double sulfates comprise 4 percent of the product on an "as is" basis. *See Def.'s Resp. to Pl.'s Statement of Material Facts Not in Issue* ¶ 9, 16 & Ex. A at 2. At oral argument, defendant again conceded that rare earth ammonium double sulfates are present in the product and constitute 4 percent of the product. *Tr.* at 32. If defendant is raising, or attempting to raise, following that oral argument an issue of material fact as to whether the imported merchandise contains various rare earth carbonates and rare earth ammonium double sulfates, defendant is contradicting its own Rule 56(h) response to plaintiff's statement of uncontested facts.

It is not clear that defendant intended its response to the court's questions as an opposition to summary judgment. But if so, defendant did not satisfy Rule 56(e), under which a party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." USCIT R. 56(e). Plaintiff's description of the imported good on the invoices as "mixed rare earth carbonate," although indicating a name under which the imported merchandise was sold in commerce, does not establish as a fact that the imported good is a carbonate compound instead of a mixture containing various rare earth carbonates, nor does it establish as a fact that rare earth ammonium double sulfates are lacking in the imported product. Defendant's own admissions, made in its statement under Rule 56(h), also defeat its subsequent attempt to raise an issue of material fact. As required by Rule 56(c), the court will enter summary judgment because the pleadings and admissions on file show that there is no genuine issue as to any material facts, including the facts to which defendant alluded in its written response to the court's questions following oral argument.

B.  The Classification Determined by Customs upon Liquidation Was Incorrect

In denying the two protests, Customs affirmed the tariff classification determination that it had made in liquidating the two entries, *i.e.*, classification as "cerium compounds" in subheading 2846.10.00, HTSUS (1999) ("Cerium compounds").  This classification determination, which defendant does not advocate before the court, was plainly incorrect.  The merchandise under consideration cannot be described as a "cerium compound."  As discussed *infra*, the merchandise is not a single compound but instead is a mixture consisting principally of several compounds of various rare earth metals.  A cerium compound, cerium carbonate, is present only as a component of the mixture, comprising 31 percent of the whole.  Moreover, as also discussed *infra*, the good is properly classified under another heading and not under heading 2846.

C.  By Application of General Rule of Interpretation 1, Heading 2846 Is Precluded, and Heading 3824 Is the Correct Heading for Classification of the Good

The parties have identified two headings as relevant to the classification issue presented by this case.  They are heading 2846, HTSUS ("Compounds, inorganic or organic, of rare-earth metals, of yttrium or of scandium, or of mixtures of these metals") and heading 3824, HTSUS (". . . chemical products and preparations of the chemical or allied industries . . . not elsewhere specified or included . . .").  The court's examination of the various headings, section notes, and chapter notes causes it to conclude that no other headings merit consideration.

The imported good does not conform to the usual definitions of the term "compound," as that term is generally used in referring to chemical substances.[3] According to the uncontested facts as established for purposes of summary judgment, the product is, instead, a "mixture" of various rare earth compounds, *i.e.*, rare earth carbonates and rare earth ammonium double sulfates with additional substances present.[4] Heading 2846, HTSUS, however, is not confined to separate chemically defined compounds, and, because it contains the heading term "compounds . . . of mixtures of these metals," heading 2846 includes within its scope certain substances that can be described as "mixtures." *See USR Optonix, Inc. v. United States*, 29 CIT ___, ___, 362 F. Supp. 2d 1365, 1374-75 (2005). The Explanatory Note to heading 28.46 addresses in the first paragraph the question of which mixtures of rare earth compounds fall within the heading and which do not. The Explanatory Note provides as follows:

> This heading [*i.e.*, heading 28.46] covers the inorganic or organic compounds of yttrium, of scandium or of the rare-earth metals of heading 28.05 (lanthanum, cerium, praseodymium, neodymium, samarium, europium, gadolinium, terbium, dysprosium, holmium, erbium, thulium, ytterbium, lutetium). The heading also covers compounds derived directly by chemical treatment from mixtures of the elements. This means that the heading will include mixtures of oxides or hydroxides of these elements or mixtures of salts having the same anion (e.g., rare-earth metal chlorides), but not mixtures of salts having different anions, whether or not the cation is the same. The heading will not therefore, for example, cover a mixture of europium and samarium nitrates with the oxalates nor a mixture of cerium chloride and cerium sulphate since these examples are not compounds derived directly from mixtures of elements, but are

---

[3] The term "chemical compound" is generally used to refer to "a substance composed chemically of two or more elements in definite proportions (as opposed to a *mixture*)." 3 *The Oxford English Dictionary* 629 (2d ed. 1989) (emphasis in original).

[4] The term "mixture" is defined as "[a]n aggregate composed of two or more distinct chemical components which retain their identities regardless of the degree to which they have become mingled." *McGraw-Hill Encyclopedia of Chemistry* 607 (5th ed. 1983).

> mixtures of compounds which could be conceived as having been made
> intentionally for special purposes and which, accordingly, fall in *heading 38.24*.

Explanatory Note 28.46 (emphasis in original).  In the text beyond the first sentence, the

paragraph is directed, at least in part, to explaining the intended meaning of the heading term

"compounds . . . of mixtures of these metals." *Id.*  The second sentence describes this heading

term as including "compounds derived directly by chemical treatment from mixtures of the

elements." *Id.*  The note as a whole clarifies that the term "compounds derived directly by

chemical treatment from mixtures of the elements" includes certain mixtures as well as

chemically defined compounds. *See id.*  Concerning the particular question of mixtures of salts

of rare earth metals, the note draws a distinction between mixtures in which all the salts present

contain the same anion (regardless of whether they have different rare earth metal cations) and

those mixtures in which the salts contain different anions.[5]

Rare earth carbonates and rare earth ammonium double sulfates conform to technical

definitions of the term "salts."  A "salt" is defined as a "substance produced by the reaction of an

acid with a base.  A salt consists of the positive ion of a base and the negative ion of an acid."

10 *The New Encyclopædia Britannica (Micropædia)* 363 (15th ed. 1986).  A "carbonate" is "any

member of two classes of chemical compounds derived from carbonic acid or carbon dioxide

. . . .  The inorganic carbonates are salts of carbonic acid ($H_2CO_3$), containing the carbonate ion,

$CO_3^{2-}$, and ions of metals such as sodium or calcium."  2 *The New Encyclopædia Britannica*

*(Micropædia)* 851 (15th ed. 1986).  A "sulfate" is "any of numerous chemical compounds related

---

[5] A "cation" is "[a]n ion carrying a positive charge which moves toward the cathode (negative electrode) during electrolysis."  3 *The Oxford English Dictionary* 990 (2d ed. 1989). An "anion" carries "a negative charge which moves towards the anode (positive electrode) during electrolysis."  1 *The Oxford English Dictionary* 478 (2d ed. 1989).

to sulfuric acid, $H_2SO_4$. One group of these derivatives is composed of salts containing the sulfate ion, $SO_4^{2-}$, and positively charged ions such as those of sodium, magnesium, or ammonium . . . ." 11 *The New Encyclopædia Britannica (Micropædia)* 366 (15th ed. 1986).

Because the product under consideration contains rare earth carbonates but also contains rare earth ammonium double sulfates, the individual salts within the mixture cannot be described as differing in structure from one another only in having different rare earth cations. Although the rare earth carbonates and the rare earth ammonium double sulfates in the mixture all contain rare earth cations, they do not all contain the same anion. *See* Explanatory Note 28.46 (stating that this heading will not include "mixtures of salts having different anions, whether or not the cation is the same"). Thus, the mixture under consideration is outside the scope of the heading as interpreted consistently with Explanatory Note 28.46, which clarifies the meaning of the heading term "compounds . . . of mixtures of these metals" such that the mixture under consideration is not described by this term. Because no term of heading 2846 describes the good, classification thereunder is precluded by application of GRI 1, HTSUS.

Defendant characterizes the rare earth ammonium double sulfates as "impurities" or "by-products" and directs the court's attention to Note 1(a) to Chapter 28, HTSUS, under which, defendant argues, the court should disregard the presence of the rare earth ammonium double sulfates for classification purposes. The court finds no merit in this argument. Note 1(a) to Chapter 28 provides that "[e]xcept where the context otherwise requires, the headings of this chapter apply only to: (a) Separate chemical elements and separate chemically defined compounds, whether or not containing impurities . . . ." Note 1(a) to Ch. 28, HTSUS (1999). This chapter note does not address, let alone resolve, the issue of whether the rare earth

ammonium double sulfates should be disregarded as impurities for purposes of determining whether the imported good is described by the term "compounds . . . of mixtures of these metals" as used in heading 2846.  Instead, the chapter note establishes the principle that a separate chemical element or a separate chemically defined compound that contains impurities will not be excluded, solely on the basis of those impurities, from a heading within Chapter 28 that is confined (as are most of the headings of the chapter) to separate chemical elements or separate chemically defined compounds.  Heading 2846, however, is not confined to separate chemical elements and separate chemically defined compounds, as is made clear by Explanatory Note 28.46 and also by the General Explanatory Note to Chapter 28, which lists heading 2846 as one of the specified "exceptions to the rule that this Chapter is limited to separate chemical elements and separate chemically defined compounds."

Thus, any valid argument that the imported good is classified under heading 2846 cannot rely on Note 1(a) to Chapter 28, HTSUS.  Defendant, however, also advances an argument to the effect that the rare earth ammonium double sulfates, even when considered apart from Note 1(a) to Chapter 28, must be treated as an impurity and disregarded because plaintiff has not demonstrated that the rare earth ammonium double sulfates have a commercial use.  A flaw in this argument is apparent from an examination of the scope of heading 2846, the article description for which explicitly identifies "compounds . . . of rare earth metals."  The rare earth ammonium double sulfates that defendants would have the court characterize as "impurities" are actually salts of rare earth metals.  Salts of rare earth metals are, indisputably, rare earth compounds within the scope of heading 2846; indeed, Explanatory Note 28.46 suggests that salts of rare earth metals are among the principal groups of rare earth compounds that are classified

within heading 2846.  Because rare earth compounds, including salts of rare earth metals, are the very subject of heading 2846, the court concludes that it is impermissible to treat particular salts of rare earth metals that are present within the imported mixture as "impurities" for purposes of determining whether the good under consideration – a mixture consisting principally of rare earth compounds – falls within the scope of heading 2846.

The difficulty with defendant's argument is even more apparent when the scope of the heading is analyzed according to Explanatory Note 28.46, which in the context of defining the heading term "compounds . . . of mixtures of these metals" confirms that certain mixtures of rare earth compounds are within the scope of the heading and also provides the above-described test for mixtures of salts of rare earth metals, under which only certain mixtures of rare earth salts (*i.e.*, those in which all salts present have the same anion) fall within the scope.  In setting forth the test, the Explanatory Note does not provide an exception for rare earth salts present within a mixture that do not have, or may not have, a commercial use after isolation resulting from further processing of the mixture that occurs following importation.  The Explanatory Note, rather, is concerned with the identity of the particular salts included in the mixture and in no way addresses the commercial uses, or absence of commercial uses, to which components of the mixture may be susceptible following post-importation processing.  Thus, the note sets forth a specific test to define a critical term of the heading, "compounds . . . of mixtures of these metals," which defendant's classification argument essentially would require this court to disregard. Defendant's argument, in this respect, would have the court resolve the issue posed by the presence of the rare earth ammonium double sulfates by resort to a use-related principle that is at odds with the Explanatory Note and that appears nowhere in the language of the article

description for heading 2846 or in any related section or chapter note of the HTSUS. For these reasons, the court is unable to accept defendant's overly broad construction of the scope of heading 2846.

In responding to a question by the court as to what rule or tariff classification principle other than Note 1(a) to Chapter 28 would require the court to disregard the presence of the rare earth ammonium double sulfates, defendant points the court to the principle of *de minimis non curat lex*. Defendant cites as instructive the decisions in *United States v. Cavalier Shipping Co.*, 60 CCPA 152, C.A.D. 1103, 478 F.2d 1256 (1973), and *Ginger Dry Ginger Ale, Inc. v. United States*, 43 Cust. Ct. 1, C.D. 2094 (1959). However, neither *Cavalier Shipping* nor *Ginger Dry Ginger Ale* establishes a rule or principle applicable to the tariff classification issue presented by this case.

*Cavalier Shipping* involved the classification under the previous Tariff Schedule of the United States ("TSUS") of two formulations of a liquid pesticide product in which methyl bromide was the sole active ingredient. *Cavalier Shipping*, 478 F.2d at 1257. One formulation consisted of 98 percent methyl bromide and 2 percent chloropicrin; the other was comprised of 68.6 percent methyl bromide, 30 percent petroleum hydrocarbons (an inactive ingredient included as a diluent or propellant), and 1.4 percent chloropicrin. *Id.* In both formulations, the chloropicrin, which in the low levels present had no pesticidal properties, was included to provide a unpleasant aroma that would serve as a warning of the hazardous presence of the methyl bromide in the event of leakage of the product. *Id.* The U.S. Court of Customs and Patent Appeals ("CCPA"), affirming the judgment of the U.S. Customs Court, rejected the claim that the product was classifiable under item 405.15, TSUS as a pesticide obtained, derived, or

manufactured in part from a benzenoid product, even though appellant had established that the chloropicrin was of benzenoid origin. *Id.* at 1259. The CCPA adopted the reasoning of the Customs Court, which applied a quantitative-functional test under which the TSUS provision for pesticides in part of benzenoid origin will describe an article containing any amount of a benzenoid ingredient that plays a part in the article's principal function or an article containing a benzenoid ingredient that does not play a part in the article's principal function, but is nevertheless present in commercially meaningful quantities. *Id.* at 1257-59. By the same reasoning, the CCPA rejected appellant's alternative classification in item 409.00, TSUS, as a mixture in part of a benzenoid pesticide product and affirmed classification in item 429.48, TSUS, which applied to other halogenated hydrocarbons. *Id.* at 1259.

The CCPA in *Cavalier Shipping* reached its determination of classification by construing various TSUS provisions that are not analogous to the HTSUS provisions at issue in this case, including a headnote that defined "in part of" as containing "a significant quantity of the named material" and to which a *de minimis* rule was applicable, and a TSUS principle assessing mixtures at the highest rate applicable to any component material. 478 F.2d at 1257-59. Accordingly, *Cavalier Shipping* does not establish a rule or principle under which the court may disregard the presence of the rare earth ammonium double sulfates.

*Ginger Dry Ginger Ale*, which also arose under the previous TSUS, involved the issue of the tariff classification of an imported flavoring extract used in manufacturing ginger ale. 43 Cust. Ct. at 1. The extract contained an amount of ethyl alcohol found upon testing to comprise 0.49 percent of the product by weight. *Id.* at 2. The alcohol performed no function in the imported flavoring extract and was present in a trace amount as a result of the process by

which ginger extract, an ingredient in the imported flavoring extract, had been obtained from ginger root using alcohol as a solvent. *Id.* The Customs Court, rejecting the government's classification of the product as "a flavoring extract containing not over 20 per centum of alcohol," determined the proper classification to be as "a flavoring extract 'not containing alcohol, and not specially provided for.'" *Id.* at 1-2, 9. The Customs Court reasoned that "the maxim *de minimis non curat lex* is applicable to the imported merchandise." *Id.* at 9. After analyzing other cases in which the *de minimis* principle was either applied or rejected, the Customs Court applied the principle, finding significant that the alcohol was present only in a trace amount, had not been deliberately added, and performed no function. *Id.* at 3-9.

The *de minimis* principle applied in *Ginger Dry Ginger Ale* does not allow the court to disregard the presence of the rare earth ammonium double sulfates for purposes of determining the scope of heading 2846, HTSUS. The alcohol in the imported flavoring extract was present in a trace amount (0.49 percent). That cannot be said of the rare earth ammonium double sulfates, which are present at a level of 4 percent (6 percent on a dry weight basis) and which, as discussed above, consist of rare earth salts rather than a substance outside the scope of the heading under consideration.

### D. The Imported Merchandise Properly Is Classified in Subheading 3824.90.39, HTSUS ("Mixtures of Two or More Inorganic Compounds")

Heading 3824, HTSUS, broadly includes within its scope ". . . chemical products and preparations of the chemical or allied industries . . . not elsewhere specified or included . . . ." As indicated by Explanatory Note 38.24, the heading includes numerous products and preparations for which the composition is not chemically defined. The terms of the heading are sufficiently

broad to include the imported good. Within the heading, subheading 3824.90.39, HTSUS pertains generally to "[m]ixtures of two or more inorganic compounds" that do not fall within the specific mixtures of inorganic compounds described in subheadings 3824.90.31 through 3824.90.36, HTSUS. All compounds in the imported mixture indisputably are inorganic compounds, including the carbonates, which, although containing the carbon atom, are considered to be inorganic. 6 *The New Encyclopædia Britannica (Micropædia)* 327 (15th ed. 1986) (stating that an "inorganic compound" is "any substance in which two or more chemical elements other than carbon are combined, nearly always in definite proportions" and that "[c]ompounds of carbon are classified as organic except for carbides, carbonates, cyanides, and a few others").

Defendant argues that the imported product is excluded from heading 3824 because of the heading term "not elsewhere specified or included," based on its contention that the product is described by the terms of heading 2846. The court rejects this contention for the reasons previously discussed. Defendant offers no other reason why the imported product would not fall within heading 3824 and be described by subheading 3824.90.39, HTSUS.

## III. CONCLUSION

The imported product is properly classified in subheading 3824.90.39, HTSUS (1999), free of duty. Judgment will be entered accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: July 28, 2006
New York, New York